[Civ. No. 25522. Second Dist., Div. Two. Dec. 6, 1961.]

H. W. HILLER et al., Plaintiffs and Respondents, v. THE CITY OF LOS ANGELES et al., Defendants and Appellants.

Roger Arnebergh, City Attorney, Bourke Jones, Ralph J. Eubank, Assistant City Attorneys, Edward C. Farrell, Deputy City Attorney, Musick, Peeler & Garrett, Gerald G. Kelly and Richard T. Apel for Defendants and Appellants.

Milo V. Olson for Plaintiffs and Respondents.

FOX, P. J.—This is an appeal from a judgment declaring invalid a contract between the City of Los Angeles and a nonprofit corporation called "Friends of the Los Angeles Zoo." Also declared invalid was an ordinance authorizing and approving the contract. The ground of decision was that the city has no power to enter into such an agreement.

Plaintiffs brought this action in their capacity as taxpayers of the City of Los Angeles. By the terms of the contract which they seek to have declared invalid, an agreement entitled "Lease of Concession[1] between the City of Los Angeles and the Friends of the Los Angeles Zoo for Operation of the Los Angeles World Zoo" is to be executed following the construction of the zoo in Elysian Park. In 1957 the voters of the city approved a bond issue for recreation and park purposes, $6,613,000 of which the city proposed to apply to the zoo. Without competitive bidding, the board of recreation and park commissioners and subsequently the city council approved the contract in question and the proposed lease.

The essential terms of the contract are as follows: The Friends agree, at their own expense, to cause a research program to be undertaken by the Stanford Research Institute relative to the planning, operation, and maintenance and location of the zoo. A tract of land in excess of 600 acres, constituting nearly all of Elysian Park, is to be set aside by the city for the zoo, unless it proves to be unsatisfactory. In advance of the execution of the lease, the Friends are required to

---

[1]The title is an apparent attempt to bring the agreement within the purview of section 171, subd. 2 of the city charter, authorizing the department of recreation and parks to grant concessions in connection with park facilities. We find it unnecessary to consider this point.

finance the research program, the zoo director's salary, the purchase of animals and equipment, and various other preparatory matters. Mineral rights are reserved by the city. The city is to secure the planning and construction of the zoo. Upon completion the city and the Friends agree to enter into the lease mentioned above. It is also provided that before the lease is executed, the Friends may furnish to the board a list of the type and general provisions of concessions proposed to be operated by independent contractors, for the board's approval. No director of the Friends is to have any interest, or profit in any way from the concessions, and all of the proceeds thereof are to be applied to the current and future expenses of the Friends in the maintenance, operation, and improvement of the zoo, including all incidental activities. The city may terminate the agreement should the Friends default under its terms. A standard severability clause is also included.

The essential terms of the lease which is to be executed are as follows: It is to run for 50 years from the date of execution. Its basic provision is that the Friends agree to operate the zoo, maintain it and keep it in suitable repair for the benefit of the public, at no expense to the city. The Friends are to provide maintenance "at the Friends' cost, in particular, but without limiting the generality of the foregoing," of animals and other zoological specimens suitable for a city of the size of Los Angeles and comparable to a first-class zoo. They must also provide food and supplies and equipment in the nature of personal property. They must provide for the operation of concessions (directly or through independent contractors), and for the payment of all utility and other charges. The Friends are to provide personnel on such terms as the Friends may approve, and if the law requires the use of civil service personnel, the Friends agree to use them and reimburse the city therefor. They are to "hold harmless" the city for liability claims connected with zoo operation and are to carry $1,000,000 public liability and $100,000 property damage insurance. They are to receive all income derived from the operation of the zoo, together with all donations, and apply it exclusively to the operation, maintenance, and improvement of the zoo. The Friends are to set reasonable fees and charges for the zoo. The land and improvements involved are to belong to the city, subject to the terms of the lease. The animals and other exhibits are to belong to the Friends, who are to have the right to sell or

exchange as the judgment of the Friends dictates. The Friends are to lease, at the option of the board, the animals and other exhibits of the Griffith Park Zoo on terms to be mutually agreed upon by the Friends and the board. When the lease terminates, all net assets of the Friends are to become the property of the city. The board of recreation and park commissioners is to represent the city in its dealings with the Friends. Mineral rights are reserved to the city, and a standard severability clause is included.

The trial court held that the city and board had no power to enter into such an agreement. The judgment was apparently founded upon the twofold assumption that (1) the city charter expressly prohibits such an agreement; and (2) the contract involves an improper delegation of governmental powers generally. Although the parties raised the question of whether competitive bidding was required, the trial court did not decide the question, deeming it unnecessary in light of its holding.

A preliminary mention of some general principles would seem appropriate. ▆▆ The disposition and use of park lands is a municipal affair (*Wiley* v. *City of Berkeley,* 136 Cal.App.2d 10 [288 P.2d 123] ; *Mallon* v. *City of Long Beach,* 44 Cal.2d 199 [282 P.2d 481]), and a charter city "has plenary powers with respect to municipal affairs not expressly forbidden to it by the state Constitution or the terms of the charter." (*City of Redondo Beach* v. *Taxpayers, Property Owners, etc. City of Redondo Beach,* 54 Cal.2d 126, 137 [5 Cal.Rptr. 10, 352 P.2d 170].) ▆ Not only must any limitations on municipal power be express, they must be *clear and explicit,* and no restriction on the exercise of municipal power may be implied. "The former guide—that municipalities have only the powers conferred and those necessarily incident thereto [citation]—is inapplicable." (*City of Grass Valley* v. *Walkinshaw,* 34 Cal.2d 595, 598-599 [212 P.2d 894].)

The principal question to be decided is whether the city has divested itself of such a degree of control as to have abdicated its governmental responsibility. There are few cases dealing with the precise question here involved. The closest are two Ohio decisions. In one of them, *City of Cleveland* v. *Lausche,* 70 Ohio App. 273 [49 N.E.2d 207] the city contracted with the Museum of Natural History, a nonprofit corporation, for the development, management and operation of the city's zoo. The contract provided that the museum

was to run the zoo "as in its opinion will best serve the interests of the people of Cleveland." The determination "of what living creatures shall comprise the . . . collection" was within the "entire discretion of the museum." The museum was also given the right to hire and discharge employees. The principal limitation on the activities of the museum was that no physical changes were to be made without the permission of the city. Also, annual reports were required, which were to include a detailed report of receipts and expenditures. At pages 210-211 [49 N.E.2d], the opinion states: "It cannot be seriously contended, where the activity of operating a zoological garden comes squarely within a permissible function of a municipal corporation in the interest of promulgating [sic] public education, that the employment of the services of those who are capable of making such activity successful would constitute an ultra vires act." It was held that the agreement did not constitute an unlawful delegation of authority. The other case, McGuire v. City of Cincinnati, (Ohio App.) 40 N.E.2d 435 involved a taxpayer action seeking to cancel a lease granted by the board of park commissioners to the Zoological Society of Cincinnati, a nonprofit corporation organized for the purpose of running a zoo. An agreement similar to that in the Lausche case was involved, and that agreement was also upheld.

County of Los Angeles v. Dodge, 51 Cal.App. 492 [197 P. 403], appears to be the California case factually closest to the case at bar. In that case the City and County of Los Angeles entered into an agreement with a nonprofit corporation which was of an unconventional nature somewhat akin to a lease. The corporation was to build a stadium in Exposition Park adequate to accommodate 75,000 persons, at the expense of the city and county. The only limitation on the discretion of the corporation in the construction of the stadium was that it was to be "suitable" for various purposes expressed. For a period of slightly less than 10 years, the corporation was to control the use of the stadium half of the time, devoting it to public purposes consistent with the trust imposed on the property. "Revenue derived" was to be expended toward maintenance of the property. The other half of the time was to be divided evenly between the city and the county. The corporation was to render, semiannually, to both the city and the county, full and complete accounts of its financial operations, receipts and disbursements under the agreement. This agreement was attacked as an attempt to

delegate nondelegable public functions. Having reviewed the terms of the agreement, the opinion states, at pages 507-508: "Here, there is no final abdication of the functions of the city, if, in view of what we shall hereafter say, there can be said to be any abdication of its functions at all. . . . [R]evenue to be derived from that use is to be expended for the maintenance of the property. . . . Allowing to the members of the city council and of the board of supervisors the honesty of purpose which we must accord to them and the soundness of judgment which we must attribute to them, . . . we are bound to consider not only that the stadium is necessary to the needs of the people of the city and the county, but that the two bodies have adopted an available means for its procurement, unless their want of honesty or lack of judgment in those matters is apparent to us. . . . [T]he rights of the [corporation] are shadowy and unsubstantial, with the city and county at all times present and apparent as the substance behind the shadow. . . . In its financial operations, under the system of reports provided for in the lease, it is subject to the rigid scrutiny and control of both bodies politic." The agreement was upheld.

A further review of the provisions of the instant agreement will reveal that adequate control had indeed been retained by the city. These are the terms designed to effectuate that purpose: (1) A list of the type and general provisions of concessions not previously approved must be submitted for the board's approval, the test being whether the proposed concessions are consistent with the public interest and the purpose of the lease; (2) all animals and other exhibits must be suitable to a city the size of Los Angeles and comparable to a first-class zoo; (3) the initial zoo director is to be approved by the board; (4) insurance policies must be approved by the city attorney; (5) admission and parking fees must be reasonable and are subject to approval of the board; (6) the board must approve major alterations and the erection of new structures; (7) the city retains the right to "open, dedicate, transfer jurisdiction and use of any and all of the premises for streets, highways, alleys, or easements" as it deems necessary; (8) *the Friends must submit to a yearly audit and furnish the city with an annual report including any information the city desires at no expense to the city*; (9) the city may at any time inspect the zoo for the purpose of determining whether the Friends are complying with the lease; (10) *the city is to have access to all books and*

*records of the Friends, including concession agreements and books and records of concessionaires "operating under the Friends"*; (11) the city may terminate the lease for violation of its terms, or in the event of financial incapacity of the Friends, *or if the zoo is not being operated in a "first-class" manner*; (12) no alcoholic beverages may be sold, and food laws must be complied with; (13) the lease is not assignable without the consent of the city; (14) two members of the board are to serve on the board of directors of the Friends without vote. Additionally, the contract authorizes the city to decide who is to plan and design the zoo; (15) the Friends agree to abide by all laws, ordinances, and regulations of the city in connection with its operation of the zoo or any concession therein.

A fair appraisal of these provisions makes it apparent that a reasonable degree of control, consistent with the *Cleveland, Cincinnati,* and *Dodge* cases, has been retained by the city. And attributing to the city representatives responsible for this arrangement the "honesty of purpose . . . and the soundness of judgment which we must attribute to them" (see also *Silver* v. *City of Los Angeles,* 57 Cal.2d —— [17 Cal. Rptr. 379, 366 P.2d 651] filed November 30, 1961), we are obliged to assume that they have chosen a reasonable means of attaining a desirable objective. (*Cf. Sacramento Chamber of Commerce* v. *Stephens,* 212 Cal. 607 [299 P. 728].)

In arguing that the city charter prohibits the execution of the agreement in question, plaintiffs cite us to sections 170, subdivision (a) and 171 of the charter. Section 170, subdivision (a) states in part, "The Department of Recreation and Parks shall operate, manage and control all property now or hereafter owned or controlled by the City of Los Angeles for public recreation, . . ." Section 171 reads in part, "The Department of Recreation and Parks shall have the power and the duty (1) to establish, construct, maintain, operate, and control, . . . the following: (a) All parks of the City of Los Angeles; (b) all . . . facilities for public enjoyment; (c) all property acquired by it or assigned to its jurisdiction for public recreation." Other subdivisions of the section set forth numerous other specific powers and duties. It is the position of the plaintiffs that the duty imposed upon the department, by these sections, to operate, control and manage recreation facilities precludes the instant agreement. We cannot agree. Article VI of the charter deals with the creation

and organization of the various departments of the city. Succeeding articles each deal with a particular department, designating the "powers" and "duties" of each. Section 170 is the first section in the article concerning the department of recreation and parks. It obviously is intended to do no more than confer upon that department the city's powers with respect to property set apart for recreation purposes. Section 171, subdivision (1), appears to be nothing more than a specific listing of the duties of the department with respect to the properties placed under its control by section 170. The "duty" to "control" can hardly be construed as a limitation on the general power of the department to delegate some of its duties to others, for as we have seen, limitations on the plenary powers of the municipality must be "clear and explicit." (*City of Grass Valley* v. *Walkinshaw, supra,* 34 Cal.2d 595.)

The principal case on which plaintiffs rely is *Egan* v. *City & County of San Francisco,* 165 Cal. 576 [133 P. 294, Ann.Cas. 1915A 754]. In that case taxpayers sought to invalidate an agreement between the City and County of San Francisco and the Musical Association of San Francisco, a corporation organized for the purpose of the agreement. The association was to construct an opera house on city property, title to vest in the city in trust for certain uses. The "conduct, control, management and possession" of the opera house was to be in a board of trustees, a substantial majority of whom were to be members of the association. The only limitations upon the association's control were that not less than $750,000 must be expended in the erection of the opera house; it was to be used exclusively for the production of musical events, but might be rented for other purposes when not so used, the revenue to be applied to trust purposes; exterior design was to be approved by the city and county; three of the fifteen trustees were to be city and county officials; and at least four hundred seats were to be reserved for sale at not more than $1.50 each. So far as it appears from the opinion, all other matters were within the power of the board of trustees, dominated by the association. The agreement was invalid for two reasons. The first, which, as above stated is no longer law, was that the San Francisco charter did not expressly *grant* the power to delegate its authority to operate an opera house, although the city had express authority to do it itself. The second, and no less important ground of decision was that the delegation of power was improper on

general principle. But that case is not apposite because, as stated in *County of Los Angeles* v. *Dodge, supra,* p. 507: "It is obvious from the above statement [of the facts of the *Egan* case] that the city of San Francisco, . . . had attempted to barter away its public duty and responsibility, . . ." Such is not the case here, for as we have seen, the city was careful to retain controls sufficient to bring the agreement well within the limits of legality.

Although the trial court chose not to treat the question of whether competitive bidding is required, we believe a resolution of the problem is necessary to be a complete disposition of the cause.[2] The requirement of competitive bidding was discussed in *Los Angeles Dredging Co.* v. *City of Long Beach,* 210 Cal. 348 [291 P. 839, 71 A.L.R. 161]. At page 354, the opinion states: "The first exception is founded on the fact that sometimes it is undesirable or impossible to advertise for bids for particular work. In such cases the statutory requirement is deemed not to apply. In 2 Dillon on Municipal Corporations, 1199, section 802, the law is thus stated: 'It has been held that where competitive proposals work an incongruity and are unavailing as affecting the final result, or where they do not produce any advantage . . . or it is practically impossible to obtain what is required and observe such forms, a statute requiring competitive bidding does not apply.' Our courts have approved this doctrine. (*Los Angeles Gas & Elec. Corp.* v. *City of Los Angeles,* 188 Cal. 307 [205 P. 125]; *Miller* v. *Boyle,* 43 Cal. App. 39 [184 P. 421].)" (Quoted with approval and followed in *Kennedy* v. *Ross,* 28 Cal.2d 569, 581 [170 P.2d 904].) The agreement here under consideration appears to be well within this exception, and we agree with the Ohio court that decided *City of Cleveland* v. *Lausche, supra,* that competitive bidding should not be required in transactions of this nature.

The judgment is reversed.

Ashburn, J., and Herndon, J., concurred.

A petition for a rehearing was denied December 29, 1961, and respondents' petition for a hearing by the Supreme Court was denied January 31, 1962.

---

[2]Other matters raised by the parties, such as the clauses providing for review of board decisions by the city council and the courts, are properly severable under the severability clause and for that reason a "controversy" has not arisen with respect to those matters.