[Civ. No. 1940. Fifth Dist. Sept. 19, 1974.]

CODDING ENTERPRISES, Plaintiff and Appellant, v.
CITY OF MERCED, Defendant and Respondent.

## Counsel

William J. Smith for Plaintiff and Appellant.

Williams J. Adams, City Attorney, for Defendant and Respondent.

## Opinion

**STONE, J.***—Appellant, Codding Enterprises, was the owner of a 5-acre parcel of unimproved land in the City of Merced which was zoned for the construction of 107 apartment units. In October of 1972 appellant

*Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.

sold the five-acre parcel to a third party, but before the parcel could be conveyed city ordinances required appellant to obtain permission from the city for a lot split. As a condition of approving the lot split, the city levied fees in the amount of $150 for each of the apartment units planned, for a total of $16,050. These fees were collected in lieu of dedication of land for park and recreational purposes pursuant to an ordinance of the City of Merced. After exhausting its administrative remedies appellant paid the fees under protest and subsequently filed the present action.

Appellant contends the ordinances were void in that they conflicted with a state statute, Business and Professions Code section 11546, which authorizes cities, as a condition to approval of subdivision maps, to require the dedication of land for park and recreational purposes or the payment of fees in lieu of such dedication. The word "subdivision" is defined by Business and Professions Code section 11535, subdivision (a), as a division of land into five or more parcels. The lot split into two lots resulted in fewer than five parcels. Section 11546 was amended in 1972, effective March 7, 1973, by adding the language, "or parcel map for a division of land not defined as a subdivision." This language, of course, authorizes cities to utilize the same procedure in relation to lot splits as formerly applied to subdivisions. Since the proceedings pertinent to this case occurred prior to March 7, 1973, the question of the city's authority is still with us.

Appellant asserts that the added language demonstrates that prior to the amendment the state Legislature did not intend to grant cities authority to charge fees in lieu of dedication of land for park and recreational purposes as a condition for final approval of land divisions within the city limits for a division into anything less than a subdivision (five parcels). This argument may be tenable as to general law cities which derive their authority from the Legislature. Merced, however, is a charter city. Charter cities are created pursuant to and derive their power or authority from the Constitution of the State of California (art. XI, § 5). It has been held that charter cities have authority over municipal affairs so long as its ordinances do not conflict with the federal Constitution, the state Constitution or the provisions of its own charter. (*Rivera* v. *City of Fresno,* 6 Cal.3d 132, 135 [98 Cal.Rptr. 281, 490 P.2d 793]; *Duran* v. *Cassidy,* 28 Cal.App.3d 574, 583 [104 Cal.Rptr. 793].) But, whether a particular ordinance or regulation is a municipal affair does not necessarily dispose of the question whether there is conflict with the state statute. Despite respondent's contention that a charter city's authority is plenary, subject only to the limitations of the state and federal Constitutions and its own charter, it has been held that even local matters which are of general statewide concern may be controlled by the enactment of general laws. As the Supreme

Court said in *Bishop* v. *City of San Jose,* 1 Cal.3d 56, page 63 [81 Cal. Rptr. 465, 460 P.2d 137], " 'What may at one time have been a matter of local concern may at a later time become a matter of state concern controlled by the general laws of the state. [Citations.]' (*Pacific Tel. & Tel. Co.* v. *City & County of San Francisco,* . . . 51 Cal.2d 766, 771, 775-776 [336 P.2d 514]; *Butterworth* v. *Boyd* [12 Cal.2d 140, 147 (82 P.2d 434, 126 A.L.R. 838)].)"

The question that arises is how do we determine when a general law that touches upon a municipal affair is controlling, that is, preempts the field. In discussing this question, the Supreme Court said in *Bishop* v. *City of San Jose, supra,* 1 Cal.3d at page 63: "In exercising the judicial function of deciding whether a matter is a municipal affair or of statewide concern, the courts will of course give great weight to the purpose of the Legislature in enacting general laws which disclose an intent to preempt the field to the exclusion of local regulation (see *Ex parte Daniels* (1920) 183 Cal. 636, 639-640 [192 P. 442, 21 A.L.R. 1172]), and it may well occur that in some cases the factors which influenced the Legislature to adopt the general laws may likewise lead the courts to the conclusion that the matter is of statewide rather than merely local concern. However, the fact, standing alone, that the Legislature has attempted to deal with a particular subject on a statewide basis is not determinative of the issue as between state and municipal affairs, nor does it impair the constitutional authority of a home rule city or county to enact and enforce its own regulations to the exclusion of general laws if the subject is held by the courts to be a municipal affair rather than of statewide concern; stated otherwise, the Legislature is empowered neither to determine what constitutes a municipal affair nor to change such an affair into a matter of statewide concern." (Fn. omitted.)

There would not seem to be much question but that regulation of land use, particularly in relation to multi-unit housing which results in population saturation, vehicular congestion and elimination of open space for park and recreation areas, is of vital concern to a municipality. It appears to us that applying the rather indefinite criteria suggested by the court in *Bishop* v. *City of San Jose, supra,* 1 Cal.3d 56, 63, Merced, as a charter city, was exercising a municipal function in regulating the use of land within its boundaries for multiple housing.

Moreover, we do not find an intimation in section 11546 that the Legislature intended to preempt the authority of a charter city to control land development within its boundaries except as to subdivisions. Looking at the legislative history of the section, we find in the introduction to the Interim Committee Report which preceded the enactment of the legislation

the following: "Concern is being expressed statewide in California that we may be in danger of '. . . building ourselves into a cement-lumber jungle.' Land pressures have been building steadily and the rising market price of each available scrap of urban land has made land the focus of competitive interests and competitive values. Recreation experts, planning commissions and conservationists have long insisted that the provision of recreation areas in subdivisions is a necessity. They argue that healthful, productive community life depends in part on the availability of recreation and park space.

"Population congestion magnifies the need for urban open space. It is perhaps the visual impact of thousands upon thousands of houses built row on row without relief of open space which has been most responsible for stimulating burgeoning citizen interest in the problem of providing for recreation areas in subdivision developments. House Resolution 239, authorizing a study of the need for parks in subdivisions is but one symptom of this general and increasing citizen concern." (21 Assem. Interim Com. Report, Municipal and County Government (1963-1965) p. 33; fn. omitted.)

In the face of such a foreboding introduction to the report, it appears that the Legislature enacted a general statute enabling general law cities, which otherwise could not control land development within their boundaries, to control subdivisions. The Legislature did not lay down statewide restrictive guidelines which necessarily would have been interpreted as an intention to preempt the field. (See Bus. & Prof. Code, § 11540.1.) The statute did not have the ring of a limitation of authority. Appellant argues that the broadening of Business and Professions Code section 11546 by the 1972 amendment to include lot splits is an indication of intent to enlarge a limited power. It seems more reasonable that since the original enactment was an amendment to a section of the Subdivision Map Act (Bus. & Prof. Code, §§ 11500-11641) the omission of the phrase "or . . . division of land not defined as a subdivision" was inadvertent. When it was realized that general law cities had no authority to regulate lot splits or any property divisions less than subdivisions within its boundaries, the 1972 amendment was enacted to correct this deficiency.

In conclusion, we do not deem the Merced city ordinances to be in conflict with Business and Professions Code section 11546. They accomplish the same purposes by preventing the evils of unregulated land development expressed in the introduction to the Assembly Interim Committee Report,

*supra.* In short, it is consonant with rather than in conflict with section 11546.

The judgment is affirmed.

Brown (G. A.), P. J., and Gargano, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied November 13, 1974.