[Civ. No. 48044. Second Dist., Div. One. Nov. 2, 1976.]

GRACE E. SIMONS et al., Plaintiffs and Appellants, v.
CITY OF LOS ANGELES et al., Defendants and Respondents.

**COUNSEL**

G. G. Baumen for Plaintiffs and Appellants.

Burt Pines, City Attorney, Claude E. Hilker, Jerome Montgomery, Assistant City Attorneys, and Gregory C. O'Brien, Jr., Deputy City Attorney, for Defendants and Respondents.

**OPINION**

**HANSON, J.—**

## THE CASE

Plaintiffs Grace E. Simons, Lawrence E. Emme, Irene Ferguson, Margaret Heerdt, and Lewis H. Heerdt (hereinafter referred to collectively as Simons) appeal from a judgment by the trial court, sitting without a jury, denying their request for a permanent injunction against the City of Los Angeles (hereinafter referred to as the City) and various identified agencies and officers thereof to prevent police recruits from engaging in training activities in Elysian Park. Simons also appeals from the trial court's pretrial order sustaining without leave to amend a general demurrer to their complaint requesting the court to declare section 172 of the Los Angeles City Charter (hereinafter referred to as the City Charter) transferring 21.464 acres of Elysian Park to the department of public works (hereinafter referred to as DPW) for use for police training and facilities invalid.

This case is one of five separate lawsuits brought by Simons against the City and its officers in which it is claimed that the Los Angeles Police Academy (hereinafter referred to as the Academy) has made illegal and improper use of training facilities in Elysian Park and engages in unlawful use of adjoining park land.

In their original complaint for declaratory relief and injunction in the present action Simons made, in substance, the following allegations of fact: Plaintiffs-appellants are residents and taxpayers of the City while defendants-respondents are the City, its councilmen, commissioners of its board of public works, members of its board of police commissioners, and chief of police; that the City is governed by a municipal charter; that a 21.464-acre parcel in Elysian Park, which is a dedicated public park, is being illegally used for police training facilities; that section 170 of the City Charter provides that the department of recreation and parks (hereinafter referred to as DRP) shall operate all property owned by the City and used for parks and *"no such site shall be devoted or transferred to any other purpose in whole or in part without permission of said Board"* and that all dedicated parks are to "forever remain to the use of the public involate; . . ."; that the Public Park Preservation Act (hereinafter referred to as the Park Act) of 1971 (Pub. Resources Code, §§ 5400-5409)

restricts the acquisition and transfer of public park property in the state; and that section 5401 thereof provides in pertinent part: "No city, city and county . . . shall acquire . . . any real property, which property is in use as a public park at the time of such acquisition, for the purpose of utilizing such property for any non-park purpose, unless the acquiring entity pays or transfers to the legislative body of the entity operating the park sufficient compensation or land, or both, as required by the provisions of this chapter to enable the operating entity to replace the park land and the facilities thereon." The complaint further alleges that section 5406 of the Park Act requires that before the acquisition of park land for nonpark use the City must conduct a public hearing pursuant to notice and that any City resident may thereafter institute legal action to determine whether its action complies with the Park Act; that the characteristics of the property and facilities which may be substituted are defined by section 5407.1 of the Park Act; that the author of the Park Act has declared that it was the legislative intent to prevent the reduction of public park land by applying the Park Act to every city; and that the Park Act's provisions should be applicable to an agency for an intra-city transfer of park property for nonpark purposes.

The complaint further alleges that section 234 of the City Charter gives the board of public works (hereinafter referred to as BPW) power to acquire property as necessary for any public work of which it has charge; that the Elysian Park parcel in issue has for about 35 years been leased by the City to the Police Revolver and Athletic Club (hereinafter referred to as the Club) for $1.00 a year, with a permit for a police training facility to be operated thereon; and that the city attorney issued a written opinion that the use of such land for police training might be deemed improper by the courts, and also questioned the validity of the lease to the Club pursuant to section 390 of the City Charter which requires contracts in excess of three years to be approved by ordinance. Simons alleged also that the terms of the permit issued to the Club in 1935 are still in full force and effect; that the permit provides, among other things, that the Club shall permit the public to enter the area free of charge and to use the premises in all respects as members of the permittee Club, and that the powers of the DRP in its supervision of Elysian Park were not to be restricted; and that voters at a municipal election in June 1968 approved a bond indebtedness for the acquisition and construction by the City of additions and improvements for police training facilities, excepting therefrom Elysian Park. Simons further alleges that the police commissioners on November 2, 1970, adopted a

recommendation by the chief of police that a charter amendment permitting the transfer of this 21 acres of land to the BPW for use for police training facilities be placed on the ballot; that the BPW in a letter to the mayor pointed out that the police department proposed a $5 million addition to the present training facility; that the recommendation for a charter amendment to transfer the land to the BPW was submitted to the City Council (council file No. 70-5114); that the BPW did not prepare or have made an environmental impact report (hereinafter referred to as EIR) as required (Pub. Resources Code, §§ 21150, 21151; 42 U.S.C. §§ 4331, 4332); that neither the BPW nor the City Council undertook to comply with the provisions of the Park Act; and that the City Council adopted a resolution to place the proposed charter amendment on the ballot on August 10, 1972.

It is alleged further that the proposed charter amendment, designated Proposition "U," was placed on the ballot at the general election on November 7, 1972;[1] that Simons filed a petition for a writ of mandate to revoke the resolution of the City Council to place the charter amendment on the ballot, but their petition was denied; that the Court of Appeal denied their petition to invalidate the charter amendment proposal prior to the printing of the ballot; that the voters at the 1972 election approved Proposition "U"; that Proposition "U" which became section 172 of the City Charter violates the provisions of section 170 thereof; and that as a consequence section 172 is invalid and effected no transfer of the described Elysian Park property from the DRP to the BPW. Simons finally alleges that the City and its agencies consider the transfer of the 21 acres of land in Elysian Park as being effected and will proceed to utilize that area for nonpark purposes unless enjoined by the courts.

In summary, Simons has alleged that plaintiffs-appellants are a group of persons beneficially interested and directly affected by the transfer of this park land; that the transfer was invalid because: (a) the City did not have an EIR prepared; (b) the City failed to comply with the Park Act

---

[1]"The Charter of the City of Los Angeles is hereby amended by adding Section 172 thereto to read as follows:

"SECTION 172. *Location of Police Training Facility.*

"Notwithstanding any other provisions of this charter or of any ordinance to the contrary, jurisdiction over that portion of Elysian Park described in words, figures and maps in Council File 70-5114 and supplements thereto, containing 21.464 acres, more or less, and which was used as of July 1, 1972, primarily as a police training facility, is transferred to the Department of Public Works for use as public buildings and grounds, including use as police training facilities and related purposes."

which preempted the field to the state; and (c) the City acted in contravention of its own City Charter; and, finally, that an actual controversy exists between the parties. Accordingly, Simons requested the court to declare section 172 invalid, to restrain any further action by the City putting into effect the provisions of that section, and to order that the police department cease and desist training activities in Elysian Park and remove its activities altogether from that area within a reasonable time.

The trial court in hearing the general demurrer interposed by the City to the original complaint read and accepted into evidence by reference council file No. 70-5114, and considered all other documentary evidence in the record. The court thereupon sustained the general demurrer without leave to amend finding the allegations of the complaint insufficient in the following four respects: (1) the complaint fails to allege facts to show that either the state or federal Environmental Quality Act is applicable to the ongoing usage of the 21.464 acres Elysian Park site for a police training facility; (2) the complaint fails to allege facts to show that the operation, management, and maintenance of the City's parks are anything other than a municipal affair; (3) the allegations of fact do not support the assertion that section 172 of the City Charter adopted by majority vote of the electorate on November 7, 1972, is preempted by or in conflict with the Park Act; and (4) the facts alleged do not show that further action by the DRP or the City Council is required under section 170 to transfer the land since the voters by charter amendment added section 172 which effects the transfer of the property.

The trial court sustained with leave to amend the City's general demurrer to the complaint in respect to allegations that the police department may be using portions of Elysian Park other than the Academy site approved by the voters for purposes related to police training which may constitute an unlawful use of park property. The court denied the motion for preliminary injunction to require the police department to cease and desist this use and hearing on the permanent injunction with respect to the alleged unlawful use of additional park property by the police was continued.

Simons thereupon filed the first amended complaint which sought a judicial determination that use by the police department of property in Elysian Park outside of the 21 acres transferred by section 172 of the City Charter could not legally be utilized for police training activities and requested that the police be permanently enjoined from conducting

police training activities of any kind outside of that area. It was alleged, in substance, that police training activities in these areas interfered with use of the park by the general public; that police regularly used areas adjacent to the Academy including the area of the Little League baseball diamond for group calisthenics and cadence counting; that police jogged in groups sometimes four abreast, along streets and pathways in the park, sometimes interfering with traffic; that they conducted mock chase, capture, shakedown and shootout activities which were frightening and disquieting to persons unaware that these were training activities; that those in the jogging groups sometimes wore guns or carried nightsticks which was disquieting to persons using the park facilities; that their pedestrian mock arrest activities were frightening to persons using the park; that this use by the police was deliberate and was intended to discourage and eliminate the use of the park by the public; and that such uses of the park although approved by the City constituted violations of section 170 of the City Charter.

Following a trial on the issues set forth in the first amended complaint, the court denied the permanent injunction. The trial court in so doing concluded that police recruit training activities, within Elysian Park but outside the Academy grounds, were not forbidden by law or generally offensive to the public at large, did not deter the public's use of the park or cause to the specific plaintiffs in this action significant or irreparable harm, were consistent with other recreational uses of the park and were, in the cases of jogging and calisthenics, wholly recreational in character and among the generally accepted uses of Elysian Park.

## DISCUSSION

### I

Simons first contends that the allegations of the original complaint establish facts which entitled it to a determination that the transfer of the Academy site, formerly included within Elysian Park, for nonpark purposes, specifically the training of police recruits, is legally void and invalid.

A brief history of the Academy is disclosed by the documents submitted to the court, and serves to clarify the legal issues.

In 1925 a pistol range was constructed by the Club in the Solano Canyon section of Elysian Park. The range was later expanded and

improved for use in the target events of the 1932 Olympic Games. The buildings constituting the Olympic "village" constructed in that area were subsequently donated by the Olympic Games Committee to the Club. Thereafter, in 1935 the Club permitted the Los Angeles Police Department (hereinafter referred to as LAPD) to use the facilities for the activities of its newly created police training division. The DRP in that year and at regularly recurring intervals through and including 1963 granted a permit to the Club to use certain lands in Elysian Park to operate a public target range and to use the appurtenant buildings and facilities. These permits were issued upon a finding that such use of the facilities constituted a park purpose and purposes incidental thereto which were in the public interest, that the property so used was not needed for other park purposes, and that this use was not inconsistent with any present or prospective park uses. The first police recruit class graduated in 1936 and recruits have been regularly graduated from that facility ever since. Thus, the former Olympic site underwent a gradual transition from a club-operated public recreational facility, used intermittently by police training classes, into a recognized police training facility that it is today.

In 1972 the DRP considered the question whether training police recruits in Elysian Park was still consistent with park purposes, and the city attorney's office suggested that a charter amendment would be desirable to support the continued use of park property for this purpose. Following a careful consideration of the use of the land and need for police training facilities, the City Council voted to place on the ballot at the November 2, 1972, election a charter amendment proposal to authorize the continued existence of the Academy at the present location. That proposition, which was subsequently approved by the voters by a vote of 54.5 percent, transferred jurisdiction over Academy buildings and acreage to the DPW for use as a police training facility "notwithstanding any other provisions of this Charter or of any ordinance to the contrary."

Prior to the 1972 election, Simons instituted litigation in an attempt to prevent the printing of the ballot proposition on the grounds that: (1) no EIR had been prepared; (2) the proposed charter amendment conflicted with existing section 170 of the charter; (3) the City could not transfer park land to nonpark uses; and there was no provision for substitution of park lands as allegedly required by the Park Act. Simons was unsuccessful, and after the charter amendment was adopted, the present

litigation was commenced to have the new section 172 declared void on similar grounds. We consider each individually as follows.

A

■ Plaintiffs-appellants Simons assert that the filing of an EIR was required as a condition precedent to submitting Proposition "U" to the electorate since it constituted a "project" within the meaning of the California Environmental Quality Act (hereinafter referred to as CEQA) (Pub. Resources Code, § 21050 et seq.). Specifically, Simons relies upon section 21150 thereof which requires an EIR prior to the allocation of any state or federal funds to "any project which may have a significant effect on the environment, . . ." According to the case law, the preparation of an EIR is required whenever it can be fairly argued on the basis of substantial evidence that the project may have significant environmental impact (*No Oil, Inc.* v. *City of Los Angeles* (1974) 13 Cal.3d 68, 80 [118 Cal.Rptr. 34, 529 P.2d 66]) and there is no indication that either an EIR or a written negative declaration preceded the charter amendment proposal. In general courts have imposed a "low threshold" of significance in interpreting the application of the CEQA. (See e.g., *No Oil, Inc.* v. *City of Los Angeles, supra*; *County of Inyo* v. *Yorty* (1973) 32 Cal.App.3d 795, 814 [108 Cal.Rptr. 377].) In this respect the State of California Guidelines adopted February 10, 1973, pursuant to CEQA (Cal. Admin. Code, tit. 14, § 15000 et seq.), although not retroactively applicable to the actions of the City Council, provide a frame of reference for our interpretation. (*No Oil, Inc.* v. *City of Los Angeles, supra,* at p. 74, fn. 2; *Bozung* v. *Local Agency Formation Com.* (1975) 13 Cal.3d 263 [118 Cal.Rptr. 249, 529 P.2d 1017].)

Section 15037 of the guidelines provides, inter alia, that "project" shall not include "(4) The submittal of proposals to a vote of the people of the State or of a particular community." That section further provides "(c) The term 'project' refers to the underlying activity and not to the governmental approval process."

In the present case the underlying activity is the use of the Academy facilities in Elysian Park by police recruits for training, which has continued over a period of more than 40 years without substantially altering the environment or unduly burdening or distressing the local population. The activity advanced by the ballot did not constitute a "proposed project" but merely formalized that which had developed

over the preceding 40 years. As a practical matter this park land had, previous to the 1972 election, been transferred to a nonpark use. This long standing and well established use does not constitute an environmental "change" which is the criteria for requiring an EIR. (Cal. Admin. Code, tit. 14, § 15081, subd. (c).)

The transfer in and of itself would not require an EIR, and the proposed future allocation of funds for the improvement of existing facilities does not alter this conclusion. Where a project is approved prior to November 23, 1970, an EIR or negative declaration is required only if the project may have a significant effect on the environment *and* a public agency proposes to modify the project in such a way that the project might have a new significant effect on the environment. (Cal. Admin. Code, tit. 14, § 15070, subd. (a) (2).) At the time of the 1972 election there was a police training facility in Elysian Park. CEQA guidelines exempt alterations to existing facilities and exempt replacement or reconstruction of existing structures and facilities with certain restrictions (Cal. Admin. Code, tit. 14, §§ 15101, 15102). There is no indication that funds will be used for purposes outside the scope of these exemptions. Where a project is categorically exempt, the agency *may,* but is not required to, file a notice of exemption (Cal. Admin. Code, tit. 14, § 15074).

■ The National Environmental Policy Act (42 U.S.C. § 4331 et seq.) in certain cases requires an environmental impact statement (hereinafter referred to as an EIS). The federal statutory scheme has application neither to this transfer by charter amendment nor to the continued use of the land in Elysian Park for police training. There was no indication that the use of federal funds for improving the facilities was anticipated at the time of the 1972 election. It was contemplated that the funds used to support or improve the facility would be those obtained from local bond issues. The claim that an EIS was required is utterly devoid of merit.

### B.

■ Plaintiffs-appellants Simons further contend that the provisions of the Park Act have preempted the field as to the transfer of public park land for any nonpark use and render null and void any transfer which fails to comply with its requirements. In its original form, the Park Act was not applicable to intra-agency (as opposed to inter-agency) transfers of park land (Pub. Resources Code, § 5401). However, effective January 1, 1976, the act was rendered applicable to intra-agency as well as

inter-agency transfers of park lands. Section 5401, subdivision (b), amends the original Park Act to provide: "Where the operating entity and the acquiring entity are one and the same, the entity is subject to the provisions of this chapter pertaining to both operating and acquiring entities, and the entity is, as acquiring entity, required to make funds or land, or both, available pursuant to section 5405 or 5407.2, . . ." It is clear that prior to that amendment agencies were permitted to transfer park land from one agency to another without providing compensatory land or funds within the governmental entity and there is no indication that retroactive application of that amendment is justified.

In any event, the Park Act does not alter the common law concept that park regulation is a municipal affair, and it cannot, therefore, be said that the state has preempted the field in this area.

"The question that arises is how do we determine when a general law that touches upon a municipal affair is controlling, that is, preempts the field. In discussing this question, the Supreme Court said in *Bishop* v. *City of San Jose, supra,* 1 Cal.3d at page 63 [81 Cal.Rptr. 465, 460 P.2d 137]: 'In exercising the judicial function of deciding whether a matter is a municipal affair or of statewide concern, the courts will of course give great weight to the purpose of the Legislature in enacting general laws which disclose an intent to preempt the field to the exclusion of local regulation (see *Ex parte Daniels* (1920) 183 Cal. 636, 639-640 [192 P. 442, 21 A.L.R. 1172]), and it may well occur that in some cases the factors which influenced the Legislature to adopt the general laws may likewise lead the courts to the conclusion that the matter is of statewide rather than merely local concern. However, the fact, standing alone, that the Legislature has attempted to deal with a particular subject on a statewide basis is not determinative of the issue as between state and municipal affairs, nor does it impair the constitutional authority of a home rule city or county to enact and enforce its own regulations to the exclusion of general laws if the subject is held by the courts to be a municipal affair rather than of statewide concern; stated otherwise, the Legislature is empowered neither to determine what constitutes a municipal affair nor to change such an affair into a matter of statewide concern.' " (*Codding Enterprises* v. *City of Merced* (1974) 42 Cal.App.3d 375, 378 [116 Cal.Rptr. 730].)

The power of a city over affairs which are exclusively municipal affairs has long been recognized and is not subject to encroachment. In general, statutes which are enacted by the state Legislature are limited in their

reach to general law cities and inapplicable to charter cities (*Ector* v. *City of Torrance* (1973) 10 Cal.3d 129, 132 [109 Cal.Rptr. 849, 514 P.2d 433]). ▌ The power of a charter city over exclusively municipal affairs is all embracing, restricted and limited only by the city's charter, and free from any interference by the state through the general laws (*City of Redwood City* v. *Moore* (1965) 231 Cal.App.2d 563, 571 [42 Cal.Rptr. 72]).

▌ A charter city has inherent authority to control, govern and supervise its own parks. "[T]he disposition and use of park lands is a municipal affair (*Wiley* v. *City of Berkeley*, 136 Cal.App.2d 10 [288 P.2d 123]; *Mallon* v. *City of Long Beach*, 44 Cal.2d 199 [283 P.2d 481]), and a charter city 'has plenary powers with respect to municipal affairs not expressly forbidden to it by the state Constitution or the terms of the charter.' (*City of Redondo Beach* v. *Taxpayers, Property Owners, etc. City of Redondo Beach*, 54 Cal.2d 126, 137 [5 Cal.Rptr. 10, 352 P.2d 170].) Not only must any limitations on municipal power be express, they must be *clear and explicit*, and no restriction on the exercise of municipal power may be implied. 'The former guide—that municipalities have only the powers conferred and those necessarily incident thereto [citation]—is inapplicable.' [Citation.]" (Italics in original.) (*Hiller* v. *City of Los Angeles* (1961) 197 Cal.App.2d 685, 689 [17 Cal.Rptr. 579].)

Accordingly, it is permissible for a city to build a courthouse in a public park since the city " 'may deal with such a park to which it holds title in fee, as it sees fit, subject only to the limitations and restrictions of its own charter. If the charter is silent on the matter of abandonment or change in use of such park, that power nevertheless inheres in such a municipality.' " (*City of Marysville* v. *Boyd* (1960) 181 Cal.App.2d 755, 757 [5 Cal.Rptr. 598].) The only exception to this rule is the acquisition of park land by dedication by private deed. (*Slavich* v. *Hamilton* (1927) 201 Cal. 299, 303 [257 P. 60].) In the present case, Elysian Park has been dedicated piecemeal as a public park over the years by the City; it was not acquired by dedication in a private deed and is not subject to such restrictions.

Even assuming, arguendo, that section 5401 of the Public Resources Code as it existed at the time of the 1972 election applied to intra-city transfers by charter cities at that time, the transfer is not invalidated. Section 5408 of the Public Resources Code provides that failure to comply with any of the provisions of the chapter "shall not affect the

validity of an acquisition by such entity or utility." Consequently, the act does not render transfers null and void; it merely superimposes the requirement of compensation in like kind of property or reasonable funds to legitimate the inherent right of a city to make intra-agency transfers of property.

## C.

Plaintiffs-appellants Simons further argue that the new section 172 conflicts with the provisions of preexisting section 170 of the City Charter. Our state Constitution provides, in pertinent part, that ". . . City charters adopted pursuant to this Constitution shall supersede any existing charter, and with respect to municipal affairs shall supersede all laws inconsistent therewith." (Cal. Const., art. XI, § 5, subd. (a).) The city charter may be adopted by a majority vote of the electors, and may be amended, revised, or repealed in the same manner. (Cal. Const., art. XI, § 3, subd. (a).) Section 269 of the Los Angeles City Charter permits amendments by the voters. By adopting the charter amendment provision now contained in section 172, the voters have rededicated public park land to nonpark purposes in a manner that is not inconsistent with charter requirements.

In *Spinks* v. *City of Los Angeles* (1934) 220 Cal. 366 [31 P.2d 193], the diversion of public park property to use as a city street was challenged on the basis of section 170 of the City Charter (then § 178) when the property was rededicated by action of the City Council. The court found that section 170 did not restrict the City's inherent power to use its property in the manner it deemed most suitable in view of changing circumstances. Accordingly, the action of the City Council in extending Wilshire Boulevard through Westlake (MacArthur) Park was held not to contravene the provisions of section 170. "The right of a municipality to meet changing conditions in its development cannot be denied, even though in so doing it imposes burdensome restrictions upon private property. [Citations.] . . . The authorities establish, also, that an abutting owner has no special right or interest which entitles him to insist upon the continued use of public property for the purpose to which it has been dedicated. . . ." (*Spinks* v. *City of Los Angeles, supra,* at p. 369.) In the present case, the charter amendment was presented to and adopted by a majority vote of the electorate, and no further action by the DRP or City Council is required to effect the transfer.

## II.

Plaintiffs-appellants Simons contend, finally, that the evidence presented at the trial entitled them to a permanent injunction to prevent police recruits from conducting training activities on Elysian Park land adjacent to the Academy, and that the findings of the trial court were contrary to the evidence.

The cases upon which Simons relies make it clear that in order to deprive police recruits of use of Elysian Park it must be shown that such activities constituted a diversion from the uses for which the park was dedicated, were inconsistent with use of the land by the public for recreational purposes, or constituted an invasion of public right. (See, e.g., *Spires* v. *City of Los Angeles* (1906) 150 Cal. 64 [87 P. 1026]; *Kelly* v. *Town of Hayward* (1923) 192 Cal. 242 [219 P. 749]; *Slavich* v. *Hamilton, supra,* 201 Cal. 299.)

The trial court concluded, on substantial evidence, that use of the park by police recruits did not constitute a diversion from park purposes, was consistent with the recreational character of the park, and constituted no interference with the enjoyment of the park facilities by the public.

"[W]ith rhythmic regularity it is necessary for us to say that where the findings are attacked for insufficiency of the evidence, our power begins and ends with a determination as to whether there is *any* substantial evidence to support them; that we have no power to judge of the effect or value of the evidence, to weigh the evidence, to consider the credibility of the witnesses, or to resolve conflicts in the evidence or in the reasonable inferences that may be drawn therefrom. No one seems to listen. . . ." (Italics in original.) (*Overton* v. *Vita-Food Corp.* (1949) 94 Cal.App.2d 367, 370 [210 P.2d 757].)

Where, as in the present case, the city charter does not specify the particular purposes for which park lands may be used, it is necessary to look to common usage and custom to ascertain the contemplated uses (*Griffith* v. *City of Los Angeles* (1947) 78 Cal.App.2d 796, 800 [178 P.2d 793]).

The evidence presented at the trial disclosed that outside of Academy grounds Elysian Park has been used for recreational purposes for some 40 years by police personnel without specific authorization by the DRP. As part of their training program, police recruits jog in groups

along roads and paths and dedicated public streets in and 'outside the park. They wear identical gray sweatsuits and sometimes count cadence while jogging. Up to approximately six months prior to trial, they sometimes wore Sam Browne belts and carried batons, and sometimes carried their revolvers in their Sam Browne belts, although these weapons were not loaded. The recruits no longer carry batons and weapons while jogging but they jog in sweatsuits approximately seven to ten hours per week. These groups are always accompanied by escorts front and rear, who are identified by yellow shirts, to avoid any problems with automobile traffic. Many other joggers also use the park, either individually or in small groups; these groups include California Highway Patrol, sheriff's department and fire department personnel.

Within Elysian Park adjacent to Dodger Stadium there is a Little League field, a portion of acreage which was transferred by the City to the Los Angeles Dodgers some years ago under an agreement providing that it might be retained by the City until as late as 1983 at which time it will revert to the Dodgers for parking and related uses. This acreage is under the control of the DRP for recreational purposes. The Little League field contains two baseball diamonds which are used by many groups for playing ball and which have been used by police recruits for calisthenics and self-defense training classes during one period of four to six weeks each year while the grass area on Academy ground which is customarily used for such activities is being reseeded. The calisthenics and self-defense training generally occur on week days and never interfere with any public recreational activity on the Little League field; at no time have Academy personnel requested that anyone leave the Little League field in order to permit recruit activities to take place there.

In the past, felony car-pull-over procedures have been practiced by Academy recruits approximately two and a half hours once each month in several small areas adjoining the Little League field. The same procedures were conducted twice a year on Sunday mornings for reserve officers from 8 a.m. to 10:30 a.m. This activity required that the recruits remove people from a vehicle, search them and place them under mock arrest. Whenever this activity took place, signs were placed in the vicinity describing the activity as police training, and often people gathered to watch. These activities no longer take place in the park since the Academy has been authorized by the Los Angeles Dodgers to use the parking lot of Dodger Stadium.

Occasionally an LAPD motorcycle drill team, which has no connection with the Academy, has used the Little League field to practice maneuvers when preparing for a parade or other special event. Motorcycle drill teams have used the area approximately 10 times between 1966 and 1972. The drill teams use the area infrequently and never use it when their practice would interfere with the use of the field by the general public.

The findings of the trial court that these uses of the park are consistent with the purposes for which the park was dedicated and with recreational activities engaged in by the public in the park are supported by substantial evidence. There is no substantial evidence in the record of interference with the enjoyment of Elysian Park by the public.

### DISPOSITION

The judgment is affirmed in all respects.

Wood, P. J., and Lillie, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied December 29, 1976.