[No. G027787. Fourth Dist., Div. Three. Oct. 16, 2001.]

SAVE MILE SQUARE PARK COMMITTEE, Plaintiff and Appellant, v. COUNTY OF ORANGE et al., Defendants and Respondents.

COUNSEL

Goodwin & Wynen, Vincent L. Goodwin and Kathleen M. Wynen for Plaintiff and Appellant.

Madory, Zell & Pleiss and Stephen J. Martino for Defendants and Respondents.

OPINION

**BEDSWORTH, J.**—This is an action by a citizens group challenging a decision on how to use park lands. Save Mile Square Park Committee (SMSPC), a nonprofit corporation, argues the trial court improperly granted summary judgment in favor of the County of Orange and its Board of Supervisors, Cynthia P. Coad, James W. Silva, Charles V. Smith, Todd Spitzer and Thomas W. Wilson.[1] We disagree, and affirm.

Mile Square Park in Fountain Valley was originally a military airfield during World War II, built on a square mile of land purchased by the federal

---

[1]We will refer to the county and board of supervisors collectively as the county, except as the context requires more specificity.

government.[2] The runways, forming a triangle, are at the center of the parcel, and we shall refer to this as the core area. It is at the center of this dispute.

In 1967, the federal government leased the area surrounding the core area, approximately 507 acres, to the county. The lease required the land to be used for park purposes, and the county created Mile Square Park. A golf course was built, occupying 145 acres. In 1973, the 507-acre tract was declared surplus land and sold to the county. Under the terms of that sale, the land was restricted to use for park and recreational purposes, and the National Park Service was made the arbiter of permissible uses. In 1982, the National Park Service approved construction of a second golf course on 62 acres of park land.

Meanwhile, in 1973, the county obtained the first of many annual licenses to use the core area, consisting of 137 acres. The county concedes that these licenses did not permit it to develop or permanently improve the parcel. So it apparently left the core area as it was and opened it to the public. In the ensuing years, the former runways were used for a variety of hobbies, including flying radio-controlled and free-flight model airplanes, launching model rockets, and racing radio-controlled and quarter-scale cars. Other uses were landsailing, walking, bicycling, and emergency driver training for police and fire department officers.

In 1991-1992, the county purchased the core area from the federal government, receiving unrestricted title. Its intent was to replace the hobby activities. The county planned to develop the core area with "a mix of traditional and commercial recreational uses" that would complement the already developed areas of the park and partially offset the cost of acquisition. Various alternative uses were studied. The county finally settled upon a plan to construct a third golf course, seven new sports fields, and a nature center.

A draft environmental impact report (EIR) was prepared to evaluate the proposed golf course/sports field/nature center plan and two alternative uses. Simultaneously, an amendment to the general development plan for the park was proposed, to add the core area. The two competing plans were labeled the "No Project" and "Permanent Hobby Area" alternatives. The former would leave the core area unchanged, to be used as before. Under the latter, the core area would be leased to the hobby groups on a long-term basis, and the groups would pay rent, make permanent improvements and provide

---

[2]The facts are drawn from the county's statement of undisputed facts, the complaint, and papers submitted on the motion for summary judgment.

appropriate insurance. The supervisors rejected both alternatives on financial and planning grounds. Neither plan would generate sufficient funds to contribute to park maintenance or help defray the purchase price of the core area, and both were inconsistent with the county's general plan for high-intensity uses in the regional park.

The county invited public comment on the proposed EIR and general development plan amendment. The county states, without contradiction, that in the period between 1996 and May 1999, representatives of SMSPC attended 17 public meetings held to discuss use of the core area. It also submitted written comments to the board of supervisors, opposing the golf course alternative.

In May 1999, the supervisors formally decided upon the golf course/sports field/nature center plan for the core area, when they unanimously certified the final EIR and approved the general development plan amendment. This action followed.

The complaint alleges the county acquired what was park property for nonpark purposes without providing a replacement park, or funds for one, in violation of Public Resources Code section 5401.[3] Three causes of action are involved in this appeal: intentional and negligent violation of the statute, and deprivation of civil rights under color of law in violation of 42 United States Code section 1983.[4]

The trial judge granted summary judgment in favor of the county on all causes of action. Upon considering both statutory and case law, she determined that golf is a park purpose within the meaning of section 5401. Since the county did not change park lands to nonpark uses, there was no statutory violation. As to the federal civil rights claim, the judge found the supervisors enjoy absolute immunity from such suits. She was right both times.

I

SMSPC argues the core area was a public park when the county purchased it, the decision to put a golf course there was a nonpark use that triggered section 5401, and a trial is needed to determine whether the county

---

[3]All further statutory references are to the Public Resources Code unless otherwise indicated.

[4]SMSPC does not appeal the grant of summary judgment on three other causes of action: two federal discrimination claims, and a state law claim that the county negligently ignored the rights of SMSPC's members to use the core area by favoring those citizens who prefer the pastime of golf.

provided land or funds for a replacement park. We conclude golf is a park purpose, so there was no statutory violation.

Section 5401 is part of the Public Park Preservation Act of 1971, codified in the Public Resources Code at section 5400 et seq. Subdivision (a) provides, in relevant part, that "[n]o . . . county . . . shall acquire . . . any real property, which property is in use as a public park at the time of the acquisition, for the purpose of utilizing such property for any nonpark purpose," unless the acquiring entity provides compensation or land, or both, to replace the park land and facilities on it. "Public park" is defined as a park operated by a public entity (§ 5400.5), but the statute offers no enlightenment on what is considered a nonpark purpose.

The issue is not a novel one. Numerous cases have considered the uses to which public park lands may be devoted. For example, in *Harter v. City of San Jose* (1904) 141 Cal. 659, 667 [75 P. 344], the court held it was permissible to lease a portion of a park for the building of a hotel for the use of the general public, where it would add to the attractiveness of the park and bring the city a profit. *Simons v. City of Los Angeles* (1976) 63 Cal.App.3d 455, 470-472 [133 Cal.Rptr. 721] determined that police recruits training in a park adjacent to the police academy did not interfere with public use of the park. And *Slavich v. Hamilton* (1927) 201 Cal. 299, 303 [257 P. 60] teaches that park uses are to be liberally construed where the land in question was purchased and dedicated to park purposes by a local government (rather than received as a gift).

■ Guidance is also provided by judicial and legislative definitions of a park. In a case that considered whether a private nursery school can be operated in a park building (it cannot), the court explained that " '[a] park is a pleasure ground set apart for recreation of the public, to promote its health and enjoyment. [Citation.].' " (*San Vicente etc. Sch. v. County of L. A.* (1956) 147 Cal.App.2d 79, 85 [304 P.2d 837], quoting *Williams v. Gallatin* (1920) 229 N.Y. 248, 253 [128 N.E. 121, 122, 18 A.L.R. 1238].) The California Wildlife, Coastal and Park Land Conservation Act (§ 5900 et seq.) defines a park as "a tract of land with outstanding scenic, natural, open-space, or recreational values, set apart to conserve natural, scenic, cultural or ecological resources for present and future generations, and to be used by the public as a place for rest, recreation, education, exercise, inspiration, or enjoyment." (§ 5902, subd. (i).) Either of these definitions would apply to a golf course.

■ We have not found any California golf course cases, but note that other states have readily found golf to be a legitimate park purpose or use.

(See, e.g., *Johnson City v. Cloninger* (1963) 213 Tenn. 71, 74 [372 S.W.2d 281, 283] [land could be taken for municipal golf course under statute permitting condemnation for park purposes]; *Golf View Realty Co. v. Sioux City* (1936) 222 Iowa 433 [269 N.W. 451] [statutory authority to purchase land for park purposes allowed acquisition for golf course].) We find these instructive and agree that a golf course is a park use.

Section 5401 applies only if the land acquired is being used as a public park *and* is thereafter put to a nonpark use. The parties dispute the prior status of the core area, but that does not prevent us from affirming summary judgment in favor of the county, because construction of a golf course was unmistakably a park use.

SMSPC concedes that golf *"may* be considered a proper use of park land," but argues that is not the case here because the golf course will make it impossible for the various hobby groups to continue using the park. Here is how it states the gravamen of its position: "[A] park area once used by hundreds of thousands of Orange County's citizens for over four decades as an open space park suitable and used for an array of diverse recreational purposes . . . now ceases to exist without a suitable replacement park."

It is apparent that the real dispute is over *how* the core area of Mile Square Park should be used—*not* whether golf is a park purpose. We certainly understand the dismay of SMSPC's members, but that does not mean we are free to set aside the county legislature's decision—made after no fewer than 17 hearings—to leave them disappointed and improve the core area with a golf course (along with sports fields and a nature center). SMSPC's complaint is political, not legal. And were we to accede to it, we would be taking on the role of a three-person legislature.

The board of supervisors of a county is empowered to purchase property for use as a public park, and to improve and manage the property. (Gov. Code, § 25353.) This necessarily means the supervisors have the discretion to decide what kind of park best satisfies the needs of its citizens—unless, of course, they fasten upon a plan for something beyond the pale of a park. That just is not the case here. Golf is a recreational activity, the new course will be open to the public, and it will bring a profit to the county rather than impose a burden on its coffers. Indeed, that was one of the reasons why the county rejected the No Project and Permanent Hobby Area alternatives— because they would not generate sufficient revenue to make a dent in the cost of acquiring the core area. The wisdom of that decision is not before us—only its legality.

The decision to replace the hobby uses of the core area of Mile Square Park with a golf course does not bring section 5401 into play, since golf is undeniably a park purpose. The trial judge, therefore, properly granted summary judgment for the county on the causes of action for intentionally and negligently violating that statute.

## II

SMSPC contends summary judgment on its 1983 claim was improper because there was a triable fact issue, but it fails to identify what is in dispute. Instead, the eleemosynary organization devotes its argument to the proposition that section 5401 gave it a reasonable expectation that existing uses of park lands would be preserved—which it characterizes as a property right—and that right was taken without due process when the county failed to provide a replacement park.

But the property right posited did not exist. SMSPC bases its argument on the premise that conversion of the core area into a golf course is a conversion to a nonpark purpose, that such a conversion is a violation of section 5401, and that plaintiffs had a reasonable expectation that the county board of supervisors would not violate the law in this way. Having found no such violation in the golf course conversion, we have, a fortiori, decided against SMSPC on this point. Since there was no violation of section 5401, the imagined right did not exist. Accordingly, we need not consider whether the supervisors were also protected from suit by governmental immunity. The county was entitled to summary judgment dismissing this cause of action as well.

The judgment appealed from is affirmed. Respondents are entitled to costs on appeal.

Sills, P. J., and Rylaarsdam, J., concurred.

Appellant's petition for review by the Supreme Court was denied January 3, 2002.