**Lori & Lynn BARNES–WALLACE, et al., Plaintiffs,**

v.

**BOY SCOUTS OF AMERICA, et al., Defendants.**

**No. 00–CV–1726–J(AJB).**

United States District Court, S.D. California.

July 31, 2003.

Jordan Charles Budd, ACLU Foundation of San Diego and Imperial Counties, Mark Danis, M. Andrew Woodmansee, Shannon M. Dailey, Morrison & Foerster LLP, M.E. Stephens, Stock & Stephens LLP, San Diego, CA, for Mitchell Barnes–Wallace, Maxwell Breen, plaintiffs.

John Peter Mullen, Office of the City Attorney, Civil Division, San Diego, CA, Theresa A Kristovich, Hughe,s Hubbard and Reed, Los Angeles, CA, George A. Davidson, Carla A. Kerr, Hughes, Hubbard and Reed, New York City, Scott H. Christensen, Hughes, Hubbard and Reed, Washington, DC, for City of San Diego, Boy Scouts of America—Desert Pacific Council, defendants.

## ORDER GRANTING IN PART AND DENYING IN PART CROSS–MOTIONS FOR SUMMARY JUDGMENT

JONES, District Judge.

In 2000, the Boy Scouts of America prevailed in its efforts to exclude from its membership an accomplished assistant scoutmaster because he identified himself as gay in public at a non-Scouting event. The United States Supreme Court held that the Boy Scouts of America, as a private, expressive organization, had a federal constitutional right to exclude from its membership individuals whose inclusion would "significantly affect the Boy Scouts' ability to advocate public or private viewpoints." *Boy Scouts of America v. Dale,* 530 U.S. 640, 650, 120 S.Ct. 2446, 147 L.Ed.2d 554 (2000). Those protected, private viewpoints include an anti-homosexual, anti-agnostic and anti-atheist stance. In addition to holding these views, the Boy Scouts displays intolerance toward individuals who identify themselves as homosexual, agnostic or atheist by denying membership to or revoking the membership of gay and nonbelieving individuals. Despite its long-held discriminatory views, the organization has maintained a long-standing relationship with public entities including local and state governments. *Id.* at 651–53, 120 S.Ct. 2446; *Boy Scouts of America v. Wyman,* 335 F.3d 80 (2d Cir.2003)(holding that the state did not violate the Boy Scouts' free speech rights by terminating the organization's 30–year participation in a workplace charitable campaign because of its discriminatory membership policy). At issue here is the City of San Diego's long-term lease of prized public parklands to the Boy Scouts. After *Dale,* it is clear that the Boy Scouts of America's strongly held private, discriminatory beliefs are at odds with values requiring tolerance and inclusion in the public realm, and lawsuits like this one are the predictable fallout from the Boy Scouts' victory before the Supreme Court.

In this case, Plaintiffs, a lesbian and an agnostic couple and their Boy Scout-aged sons, assert that the City's long-term lease

of public parkland to the Boy Scouts is (1) an unconstitutional establishment of religion under the federal and state constitutions, U.S. Const. Am. 1, 14, 42 U.S.C. § 1983; Cal. Const., Art. 1 § 4; (2) violates the state constitution's prohibition against the provision of financial support for religion, Cal. Const., Art. XVI § 5; (3) violates their equal protection rights under the federal and state constitutions, U.S. Const., Am. 14, 42 U.S.C. § 1983, Cal. Const. Art. 1 § 7; and (4) violates the City's common law duty to maintain public parkland for the benefit of the general public. Plaintiffs seek a permanent injunction rescinding the leases.

Plaintiffs Lori and Lynn Barnes-Wallace and their son and Michael and Valerie Breen and their son (hereinafter, "the Plaintiffs") filed their Cross Motion for Summary Judgment. Defendants City of San Diego (hereinafter, "the City") and Desert-Pacific Council, Boy Scouts of America (hereinafter, "BSA-DPC") have also filed separate Cross Motions for Summary Judgment. Each of the motions is fully-briefed and came on regularly for hearing on March 10, 2003. Mark Danis, Andrew Woodmansee, Jordan Budd and M.E. Stephens appeared on behalf of Plaintiffs. John Mullen appeared on behalf of the City, and George Davidson and Scott Christensen appeared on behalf of the Boy Scouts. After hearing oral argument, the Court took the motions under submission.

### Background

One must be heterosexual and swear a belief in a formal deity to be a member or adult leader in the Boy Scouts. *Pls.' SSUMF* ¶ 18. Although fully aware of the BSA-DPC's discriminatory membership policy, the City leases to it two parcels of public parkland. *BSA-DPC Resp. to Pls.'*

*SSUMF* ¶ 2. The parkland is prized community- and nation-wide. Balboa Park is considered to be the "urban jewel" in the San Diego park system and the "Heart of the City." *BSA-DPC's Resp. to Pls.' SSUMF* ¶ 4. Mission Bay Park is a unique aquatic recreational resource of major significance and proportions. *Id.* ¶ 21.

The City first leased the 18 acre Balboa Park parcel to the BSA-DPC for $1.00 per year in 1957. *Id.* ¶ 8. The purpose of the lease was to construct, operate and maintain a Boy Scout Headquarters and to conduct such exercises thereon as are in keeping with the principle and practices of Boy Scouting, without discrimination as to race, color, or creed. *Pls.' SSUMF* ¶ 9. The lease further provided that "the public in general shall not be excluded from said premises except at such times as their presence will conflict with the program of Boy Scouting." *BSA-DPC's Resp. to Pls.' SSUMF* ¶ 9.

Eight years before the Balboa Parkland lease was to expire, and in the midst of this litigation, the BSA-DPC requested that it and the City negotiate an extension of the lease. *Id.* ¶ 10. The City's exclusive negotiations with the BSA-DPC culminated in the December 4, 2001 vote by the City Council approving a 25-year lease (hereinafter, "the 2002 lease") for a nominal sum and annual administrative fee beginning January 1, 2002 with an option to renew for an additional 15-year term. *Id.* ¶¶ 12, 14. The 2002 lease includes a non-discrimination clause prohibiting the BSA-DPC from discriminating against persons based on, among other things, religion and sexual orientation. *Id.* ¶ 15. The City agrees that the nondiscrimination clause is understood to apply only to BSA-DPC's regulation of access to the property by non-Scouting individuals and entities. *BSA-DPC's Resp. to Pls.' SSUMF* ¶ 17.

In 1987, the City also entered into a 25-year lease with the BSA–DPC for a half acre parcel of public parkland located on Fiesta Island in Mission Bay Park for no charge. *Id.* ¶ 24. The BSA–DPC constructed an aquatic facility that offers a variety of aquatic-related youth activities. *Id.* ¶¶ 24, 25. The lease also contains the same nondiscrimination clause that appears in the 2002 Balboa Park lease. As with the 2002 Balboa Park lease, the City construes the nondiscrimination clause to apply to the BSA–DPC's regulation of access to the property by non-Scouting individuals and entities. *Id.* ¶ 28.

### Discussion

## I. Legal standard

Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). One of the principle purposes of the rule is to dispose of factually unsupported claims or defenses. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A fact is material when, under the governing substantive law, it could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir.1997). Thus, "[d]isputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.1987). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

A party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. The moving party can satisfy this burden in two ways: by presenting evidence that negates an essential element of the nonmoving party's case, or by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *Id.* at 322–23, 106 S.Ct. 2548. "The district court may limit its review to the documents submitted for the purpose of summary judgment and those parts of the record specifically referenced therein." *Carmen v. San Francisco Unified School Dist.*, 237 F.3d 1026, 1030 (9th Cir.2001). Therefore, the court is not obligated "to scour the record in search of a genuine issue of triable fact." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir.1996) (*citing Richards v. Combined Ins. Co.*, 55 F.3d 247, 251 (7th Cir.1995)). If the moving party fails to discharge this initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

If the moving party meets this initial burden, the nonmoving party cannot defeat summary judgment merely by demonstrating "that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir.1995) (*citing Anderson*, 477 U.S. at 252, 106 S.Ct. 2505) ("The mere existence of a scintilla of evidence in support of the nonmoving party's position is not sufficient."). Rather, the nonmoving party

must "go beyond the pleadings and by her own affidavits, or by 'the depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 56(e)).

When making this determination, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party. *See Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348. "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] he [or she] is ruling on a motion for summary judgment." *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505.

## II. Federal Establishment Clause

■ The federal constitution's Establishment Clause provides that "Congress shall make no law respecting an establishment of religion." U.S. Const. amend. I. The Supreme Court has identified its purpose as prohibition of state sponsorship, financial support and active involvement in religious activity. *Lemon v. Kurtzman,* 403 U.S. 602, 612, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). The Establishment Clause is therefore not offended by government actions that have a secular purpose, a principal or primary function that does not advance or inhibit religion, and which do not foster an excessive government entanglement with religion. *Id.* at 612–13, 91 S.Ct. 2105. At issue here is whether the City's lease of the public parkland to the BSA–DPC has the principal or primary effect of advancing religion.

■ "To determine whether government aid has the effect of advancing reli-

gion, courts now consider whether the aid program (1) results in governmental indoctrination; (2) defines its recipients by reference to religion; or (3) creates an excessive entanglement." *Agostini v. Felton,* 521 U.S. 203, 234, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997). When government "aid is allocated on the basis of neutral, secular criteria that neither favor nor disfavor religion, and is made available to both religious and secular beneficiaries on a nondiscriminatory basis," "the aid is less likely to have the effect of advancing religion" because it is less likely to result in state-sponsored indoctrination or the creation of a symbolic union between government and religion. *Id.* at 231, 117 S.Ct. 1997.

Three years after *Agostini,* the Supreme Court issued a plurality opinion in another school aid case, *Mitchell v. Helms,* 530 U.S. 793, 120 S.Ct. 2530, 147 L.Ed.2d 660 (2000), in which the Court held that a federal program providing federal funds to public and private elementary and secondary schools to implement "secular, neutral, and nonideological" programs by providing "services, materials, and equipment" was not a law concerning the establishment of religion. In practice, about one-third of the funds went to private schools, most of which were parochial schools. Justice O'Connor, who wrote the majority opinion in *Agostini,* wrote a concurring opinion in *Mitchell.* The differences between the plurality opinion and Justice O'Connor's concurrence suggest *Agostini's* limits.

*Agostini* effectively recast *Lemon's* third prong as but one of the three factors in determining whether a law has the effect of advancing religion, the other two being whether the aid (1) results in governmental indoctrination; or (2) defines its recipients by reference to religion. *Agos-*

*tini,* 521 U.S. at 234, 117 S.Ct. 1997; *Mitchell,* 530 U.S. at 808, 120 S.Ct. 2530. Justice Thomas framed the issue of effect as follows: "whether government aid to religious schools results in governmental indoctrination is ultimately a question of whether any religious indoctrination that occurs in those schools could reasonably be attributed to governmental action." *Mitchell,* 530 U.S. at 809, 120 S.Ct. 2530. According to the plurality, if the government aids indoctrination to a broad range of recipients, it cannot be said that the government is responsible for indoctrination by any one recipient. *Id.* In other words, aid is neutral if the religious, irreligious and areligious are equally eligible. *Id.*

Justice O'Connor declined to join the plurality opinion, finding that the opinion "announces a rule of unprecedented breadth." Her concurrence rejects the plurality's invitation to give the principle of "neutrality" an almost singular degree of importance in Establishment Clause inquiries. *Id.* at 837–38, 120 S.Ct. 2530. While Justice O'Connor agrees that neutrality is "an important reason for upholding government-aid programs against Establishment Clause challenges," she disagrees that "a government-aid program passes constitutional muster *solely* because of the neutral criteria it employs as a basis for distributing aid." *Id.* at 839, 120 S.Ct. 2530.

Despite these reservations, Justice O'Connor agreed with the plurality that the government aid program in *Mitchell* should be upheld. In finding that the program did not define aid recipients by reference to religion, she emphasized the importance of scrutinizing a government-aid program to determine whether the criteria for disbursement of the aid creates a financial incentive to undertake religious indoctrination. *Id.* at 845, 120 S.Ct. 2530. No such financial incentive is present "where the aid is allocated on the basis of neutral, secular criteria that neither favor nor disfavor religion, and is made available to both religious and secular beneficiaries on a nondiscriminatory basis." *Id.* at 846, 120 S.Ct. 2530 (quoting *Agostini,* 521 U.S. at 231, 117 S.Ct. 1997).

Plaintiffs argue that the leases have the primary effect of advancing religion because they are aid given directly to a religious organization and are not aid allocated on the basis of neutral, secular criteria. Plaintiffs assert that the leases are naturally perceived by a reasonable observer as an endorsement of the entire regional program of Scouting, which is administered from the Balboa Park property and has as its purpose the inculcation of religious belief and observance in youth. The "reasonable observer" would conclude that the leases are used to advance religious indoctrination. Plaintiff also argues that the leases have the primary effect of advancing religion because they are government aid to a pervasively sectarian organization. The BSA–DPC contends that as a nonsectarian organization, it is beyond the reach of the Establishment Clause, but that even if it were sectarian, the leases satisfy the Establishment Clause because they are part of a program whereby City parkland is offered to a variety of groups, both religious and secular, on a neutral basis for the secular purpose of providing recreational facilities. The City also argues that the "pervasively sectarian" test is no longer persuasive and that the City does not provide any direct funding to the BSA–DPC.

## A. The pervasively sectarian test cannot be reconciled with current Supreme Court cases

The Court agrees with Defendants that, although not formally overruled, the per-

vasively sectarian test cannot be reconciled with the Supreme Court's recent Establishment Clause precedent. According to the pervasively sectarian test, "[a]id normally may be thought to have a primary effect of advancing religion when it flows to an institution in which religion is so pervasive that a substantial portion of its functions are subsumed in the religious mission[.]" *Hunt,* 413 U.S. at 743, 93 S.Ct. 2868. Therefore, "no state aid at all [may] go to institutions that are so 'pervasively sectarian' that secular activities cannot be separated from sectarian ones, and (2) that if secular activities can be separated out, they alone may be funded." *Roemer v. Bd. of Public Works,* 426 U.S. 736, 755, 96 S.Ct. 2337, 49 L.Ed.2d 179 (1976).

An organization is "pervasively sectarian" when its religious and secular aspects are inseparable. *Tilton v. Richardson,* 403 U.S. 672, 680, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971); *Roemer,* 426 U.S. at 759, 96 S.Ct. 2337; *Bowen v. Kendrick,* 487 U.S. 589, 609–610, 108 S.Ct. 2562, 101 L.Ed.2d 520 (1988). An outright ban on federal grants to church-related colleges and universities is warranted only when "religion so permeates the secular education provided by church-related colleges and universities that their religious and secular educational functions are in fact inseparable." *See Tilton,* 403 U.S. at 680, 91 S.Ct. 2091; *see also Roemer,* 426 U.S. 736, 96 S.Ct. 2337. The category of organizations that may be called "pervasively sectarian" is narrow. *Mitchell,* 530 U.S. at 826, 120 S.Ct. 2530 (plurality opinion). Relevant but not conclusive as to whether an organization is pervasively sectarian are (1) explicit corporate ties to a religious faith; (2) by-laws or policies that prohibit any deviation from religious doctrine; and (3) whether the organization is "religiously inspired." *Bowen,* 487 U.S. at 621, 108 S.Ct. 2562.

Although the pervasively sectarian test has not yet been officially dispensed with, four members of the current Supreme Court have stated explicitly that the pervasively sectarian nature of a government aid recipient is no longer relevant. *Mitchell,* 530 U.S. at 826, 120 S.Ct. 2530(plurality opinion); *see also Columbia Union College v. Clarke,* 527 U.S. 1013, 119 S.Ct. 2357, 144 L.Ed.2d 252 (1999)(Thomas, J., dissenting from denial of petition for writ of certiorari). In calling for its demise, the plurality in *Mitchell* noted that the Supreme Court had not relied on the test to strike down an aid program since 1985 when the Court did so in *Aguilar v. Felton,* 473 U.S. 402, 105 S.Ct. 3232, 87 L.Ed.2d 290 (1985), and *School Dist. of Grand Rapids v. Ball,* 473 U.S. 373, 105 S.Ct. 3248, 87 L.Ed.2d 267 (1985), and that the Court had since overruled *Aguilar* in full and *Ball* in part. In *Bowen,* the Court emphasized that the category of organizations that could be called pervasively sectarian was limited and that Justices Kennedy and Scalia had questioned whether the test was "well-founded." *Id.* at 826–827, 120 S.Ct. 2530 (citing *Bowen,* 487 U.S. at 624, 108 S.Ct. 2562). The Court has since upheld aid programs to students who attended pervasively sectarian schools, despite dissents arguing the relevance of the pervasively sectarian doctrine. *Id.* at 827, 120 S.Ct. 2530.

Plaintiffs nonetheless urge this Court to follow the suggested lead of the majority in *Steele v. Industrial Development Bd. of Metropolitan Gov't Nashville,* 301 F.3d 401, 408–409 (6th Cir.2002). The *Steele* court indicated in dicta that were it necessary it would apply the pervasively sectarian test despite its questionable vitality because (1) it has not yet been explicitly rejected by the Supreme Court, (2) the Supreme Court instructs lower courts to

treat its prior cases as controlling unless the Supreme Court itself specifically overrules them and (3) *Mitchell*, the more recent Supreme Court case apparently relied on by the district court, was a plurality opinion and therefore binding only as to its holding. *Id.* at 408–409. The *Steele* court held that the government bond program in question did not violate the Establishment Clause because it was part of a neutral program available to sectarian and secular schools and conferred only an indirect benefit on the sectarian schools. *Id.* at 416. This Court, like the *Steele* Court, finds it unnecessary to apply the pervasively sectarian test.

This Court also reads the concurrence in *Mitchell* as squarely contradicting the pervasively sectarian test. The test simply cannot be reconciled with the plurality or the concurrence, which would not object to aid that "flows to an institution in which religion is so pervasive that a substantial portion of its functions are subsumed in the religious mission," *Hunt*, 413 U.S. at 743, 93 S.Ct. 2868, so long as it does so by way of "a true private-choice program" whereby aid is dispersed to individuals who then elect to use it at a particular organization, be it secular or sectarian. *Mitchell*, 530 U.S. at 842, 120 S.Ct. 2530. Justice O'Connor explains that with a per capita school aid program,

> if the religious school uses the aid to inculcate religion in its students, it is reasonable to say that the government has communicated a message of endorsement. Because the religious indoctrination is supported by government assistance, the reasonable observer would naturally perceive the aid program as *government* support for the advancement of religion.... In contrast, when government aid supports a school's religious mission only because of independent decisions made by numerous individuals to guide their secular aid to that school, no reasonable observer is likely to draw from the facts .. an inference that the State itself is endorsing a religious practice or belief.

*Id.* at 843, 120 S.Ct. 2530 (emphasis in original) (quotations omitted). Justice O'Connor thus makes it clear that the fact that an organization receiving aid is "pervasively sectarian" is not determinative. This view of the Establishment Clause is irreconcilable with the view expressed in *Hunt*, where it is assumed that aid has the primary effect of advancing religion when it flows to a pervasively sectarian organization. *Hunt v. McNair*, 413 U.S. 734, 743, 93 S.Ct. 2868, 37 L.Ed.2d 923 (1973). This Court therefore concludes that the Supreme Court has effectively, if not explicitly, overruled use of the pervasively sectarian test. The correct inquiry here, under recent Supreme Court precedent, is whether government aid has the effect of advancing religion because the leases either result in governmental indoctrination or define their recipient by reference to religion. *Agostini*, 521 U.S. at 234, 117 S.Ct. 1997. While neutrality alone does not guarantee constitutionality on either of these grounds, it is a threshold factor that must be met when the government awards aid to religious organization. *Mitchell*, 530 U.S. at 809, 838, 120 S.Ct. 2530.

**B. A reasonable observer would perceive an advancement of religion as a result of the City's failure to use a neutral process in selecting lessees**

■ Whether a reasonable observer would perceive an advancement of religion as a result of the leases depends on whether the leases have been made available on

a neutral basis. According to Plaintiffs', the reasonable observer " 'would naturally perceive the leases as an endorsement of the entire regional program of Scouting itself, which is administered from Balboa Park and has, as its fundamental and pervasive purpose, the inculcation of religious belief and observance.' " *Pls.' Mem. P. & A.* at 19.

■ When determining whether an aid program has the primary effect of advancing religion, the Court asks whether a "reasonable observer" would perceive an advancement of religion through government aid. *Mitchell,* 530 U.S. at 843, 120 S.Ct. 2530; *Capitol Square Review and Advisory Board v. Pinette,* 515 U.S. 753, 780, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995); *Witters v. Washington Dep't of Services for the Blind,* 474 U.S. 481, 493, 106 S.Ct. 748, 88 L.Ed.2d 846 (1986). The "reasonable observer" perspective establishes at least some measure of objectivity because the "reasonable observer" is "deemed aware of the history and context of the community and forum" in which the Establishment Clause challenge arises. *See Good News Club v. Milford Central School,* 533 U.S. 98, 119, 121 S.Ct. 2093, 150 L.Ed.2d 151 (2001); *see also Pinette,* 515 U.S. at 780, 115 S.Ct. 2440.

### 1. The Boy Scouts are a religious organization

As an initial matter, the Boy Scouts is a religious organization with a "religious purpose" and a "faith-based mission to serve young people and their families." *BSA–DPC Resp. to Pls.' SSUMF* ¶¶ 166, 168, 184–187. Adult leaders and youth members of the BSA–DPC are required to have a belief in a formal deity, to swear a duty to God. *Id.* ¶¶ 161, 169, 171, 173, 174, 176–181, 183, 190, 192. Belief in God is and always has been central to BSA's principles and purposes. *Id.* ¶ 164. Adult leaders are expected to reinforce in Scouts the values of duty to God and reverence. *Id.* ¶ 235.

Scouting is referred to as "the 'sleeping giant of outreach' for local churches." *Id.* ¶ 232. Scouting offers the church "unparalleled training, materials and facility support," such as camps. *Id.* "There are few religions in America which can boast of millions of youth who meet each week and openly affirm their belief in God." *Id.* ¶ 191. "Because of Scouting's devotion to the spiritual element of character education and its willingness to submerge itself in the religious traditions of its sponsors, America's churches and synagogues enthusiastically [have] embraced Scouting." *Id.* ¶ 233. The undisputed facts thus show that the BSA engages in religious, albeit nondenominational, instruction through its various Scout oaths, religious emblems program, chaplaincy program, Religious Relationships Committee, religious publications and the integration of religion in Scouting activities.

Scouting activities are intended to further the BSA's religious purpose and faith-based mission. According to the BSA's Chaplain's guide for Scout's Camp, the camp program offers opportunities for the daily practice of religion by each individual, such as grace before meals, opportunity for prayer and meditation during the day, and a period of quiet time before Taps for campers accustomed to saying prayers before retiring. *Id.* ¶¶ 194. The spirit of Scout's Camp is "that the spiritual life of the campers is strengthened, with the result that they return home with a deeper sense of reverence and a firmer desire to be faithful in religious responsibilities." *Id.* ¶ 195. Scouting's outdoor program fur-

ther reinforces the religious nature of the Scouting program. Scout outings and other activities that span weekends should include an opportunity for members to meet their religious obligations. *Id.* ¶ 196.

To advance up the ranks in the BSA, Scouts must fulfill the program's "Duty to God" requirements. *Id.* ¶¶ 197–99. The BSA's "A Resource Booklet for Interfaith Prayers and Devotionals," provides for an interfaith service "for the worship of God and to promote fuller realization of the Scout Law and Promise." *Id.* ¶¶ 201–202. Scouts say grace in unison at meals, although no one individual is compelled to participate. *Id.* ¶¶ 203, 204. The BSA states that "it is highly important that grace at meals be conducted with reverence." *Id.* ¶ 203.

According to the BSA–DPC's website, the religious emblems programs are key spiritual components of the Scouting movement. *Id.* ¶¶ 205, 206. The religious emblems program is supervised and reviewed by the Religious Relationships Committee, which reports on religious subjects. *Id.* ¶ 215. BSA Chaplains promote interest in religious emblems programs by "inquir[ing] in casual conversation whether [Scouts] are working on an emblem," having "a supply of pamphlets or take-home fliers ... available perhaps in [their] pocket as [they] wander around the camp, preparing a vesper service based on religious emblems, scheduling a talk on religious emblems, etc." *Id.* ¶ 208. The emblems are worn on Scouting uniforms. *Id.* ¶ 209–212. The BSA's magazine, "Boy's Life," includes columns devoted to various religious emblems. *Id.* ¶ 213.

The Religious Relationships Committee also reviews religious portions of Scouting literature and publications and the BSA chaplain program. *Id.* ¶ 216. The mem-

bers of the BSA–DPC Religious Relationships Committee serve as liaisons between the BSA–DPC and community religious organizations; interpret and promote the Scouting program and the religious emblems program in churches, mosques, synagogues, and other religious organizations as a resource for their children, youth, adult and family ministries; and provide chaplain support during campouts and other events and activities. *Id.* ¶ 244. The BSA has an annual "Relationships Week" national conference addressing topics such as "Scouting in the Catholic Church," "United Methodist Scouters Workshop," "Scouting Serves the Jewish Community," "Scouting in the Lutheran Church," and "Scouting in the Church's Ministry." *Id.* ¶ 217. In 2001, "Relationships Week" included tips on the use of Scouting programs for outreach and ministry to Catholic, Jewish and Protestant youth. *Id.* ¶ 218. The BSA–DPC board has a Religious Relationships Committee which works to provide Scouts of all religions information and support on how Scouting works religion into its programs. *Id.* ¶ 243.

Some of the purposes of the BSA Chaplaincy program are to provide worship service, promote the religious emblems programs of all faiths, help develop a reverent climate for the camping experience and help campers and staff grow in their relationships with God and with each other. *Id.* ¶ 221. Scout chaplains are "responsible for the supervision of spiritual activities and for creating an environment where the 12th point of Scout Law, 'A Scout is Reverent,' can thrive." *Id.* ¶ 220. The BSA provided more than 100 ordained ministers to the 2001 National Scout Jamboree. *Id.* ¶ 223. The BSA has approved of the Chaplain Aide as a youth leadership position. *Id.* ¶ 224. The Chaplain Aide

should (1) work with the troop chaplain to plan interfaith religious services during troop outings; (2) encourage troop members to strengthen their own relationship with God through personal prayer and devotion and participation in religious activities appropriate to their faith; (3) participate in planning sessions to ensure that a spiritual emphasis is included in troop activities; (4) help the troop chaplain (or other adult) plan and conduct an annual Scout-oriented religious observance, preferably during Scout Week in February; and (5) help the troop chaplain (or other adult) recognize troop members who receive their religious emblems. *Id.* ¶ 225.

Each year, BSA designates a Sunday as "Scout Sunday" to recognize contributions of youth and adults to Scouting through a "Worship Service." *Id.* ¶ 228. The BSA publishes "A Scout is Reverent: Scout Sunday Observance," which provides the format for church services on Scout Sunday. Included in this booklet are prayers, hymns, scripture readings, benedictions and a suggested article for the church bulletin titled "Bringing Youth to Christ Through a Scouting Ministry." *Id.* The BSA also publishes the Boy Scout Songbook, which includes religious hymns and prayers and several religious booklets, *Id.* ¶ 229–30.

The BSA–DPC's Duty to God policy statement describes the interfaith service as follows: "Such services typically include the basic ingredients of prayer, relationship to a Creator, thankfulness, a short meaningful story or anecdote to illustrate a point, and use of universal religious terms so that all Scouts can feel spiritually enriched, regardless of creed. Invocations, program content, and benedictions at Scouting sponsored interfaith worship services should be non faith-specific in nature and content." *Id.* ¶ 246. The BSA–DPC publishes a column in its newsletter "The Beaver Log" called "Religious Relationship News." *Id.* ¶ 247. The newsletter is published on and distributed from the Balboa parkland property. *Id.* ¶ 247. The Winter 2002 issue devoted a page to religious news; congratulated Scouts who had earned religious emblems; described the religious emblems program and listed speakers available to promote the program; and contained a display ad for Christian Community theater's new season of plays. *Id.* The BSA–DPC has also published a booklet called "Interfaith Prayers and Devotionals." *Id.* ¶ 248. The Scout Shop sells manuals for the religious emblems programs. *Id.* ¶ 249. The BSA–DPC website maintains a religious relationships page and a link to the website P.R.A.Y. (Programs and Religious Activities with Youth) where Scouts can purchase religious materials. *Id.* ¶ 251.

■ The overwhelming and uncontradicted evidence shows that the BSA's purpose and practices are religious.[1] The Defendants nonetheless argue that the BSA–DPC's principal or primary mission is not religious because it is not a religion per se, since it operates only in accordance with the belief that children cannot be the best kind of citizen unless they believe in God. Defendants cite to two lines of cases in support of their argument. First, they

---

1. The Court notes that the BSA–DPC elected to dismantle its Scout Chapel after the Plaintiffs initiated their litigation. *BSA–DPC's Resp. to Pls.' SSUMF* ¶ 99. The chapel was an enclosed circular area with benches for seating and a lectern at the front. Attached to the lectern was a sign reading "A Scout is Reverent." The chapel was adorned with a sign calling it the "Camp Balboa Chapel." *Id.* The BSA–DPC is building a climbing wall in its place. *Id.*

cite to cases in which courts sought to define what may or may not be considered "a religion" in contexts not analogous to that here. *See Alvarado v. City of San Jose,* 94 F.3d 1223 (9th Cir.1996)(holding in part that New Age is not a religion and that the City did not violate the Establishment clause by commissioning a statute of Quetzalcoatl, a New Age symbol, to commemorate Mexican and Spanish contributions to the City's culture); *Africa v. Commonwealth of Pennsylvania,* 662 F.2d 1025 (3d Cir.1981)(holding that prisoner alleging that he was a "Naturalist Minister" of the "MOVE organization" was not entitled to a special religious diet in part because the "MOVE organization" is not a religion). In these cases, the courts were confronted with the question of whether an unconventional organization or movement not requiring that its members espouse a belief in a formal deity was "a religion" triggering free exercise rights, *Africa,* 662 F.2d at 1036, or raising Establishment Clause concerns. *Alvarado* 94 F.3d at 1232. Neither case supports Defendants' argument that a nonsectarian religious organization with the requirement that its members declare a belief in a formal deity is exempt from Establishment Clause concerns. Contrary to Defendants' argument, it is well-established that the Establishment Clause prohibits government from endorsing religious belief over nonbelief. *See County of Allegheny v. ACLU,* 492 U.S. 573, 590, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989) (the Establishment Clause is "recognized as guaranteeing religious liberty and equality to the infidel, the atheist, or the adherent of a non-Christian faith"); *Wallace v. Jaffree,* 472 U.S. 38, 105 S.Ct. 2479, 2479, 86 L.Ed.2d 29 (1985)(government is precluded "from conveying or attempting to convey a message that religion or a particular religious belief is favored or preferred"); *Everson v. Bd. of Educ. of Ewing Tp.,* 330 U.S. 1, 67 S.Ct. 504, 513, 91 L.Ed. 711 (1947)(the First Amendment "requires the state to be neutral in its relations with groups of religious believers and nonbelievers"); *Kreisner v. City of San Diego,* 1 F.3d 775, 783 (9th Cir.1993)(stating that the relevant inquiry is "whether the government's action actually conveys a message of endorsement of religion in general or of a particular religion.")

Defendants also cite to cases holding that the Boy Scouts of America does not meet the definition of a religious organization for various purposes, including federal tax exemptions. The Court bases its finding on this issue on the overwhelming record developed for the purpose of litigating this case. Not only does the BSA–DPC concede that it is a religious organization, but it insists that its religiosity is fundamental to its purpose and mission of instilling values in its youth members. *BSA–DPC's Resp. to Pls.' SSUMF* ¶¶ 166, 168, 186. Based on the organization's own admission and the overwhelming record in this case, the Court finds that the BSA–DPC is a religious organization and that the City's lease of the parkland to the religious organization raises Establishment Clause concerns.

2. **The City did not lease the Balboa Park property to the BSA–DPC by way of a religion-neutral process**

The parties agree that whether the leases were obtained on a religion-neutral basis is the crux of this dispute. Defendants view the leases as only two leases out of over 100 leases of public land by the City. They argue that the BSA–DPC became the City's lessee by way of a neutral pro-

gram through which the City leases publicly-owned land to "well over 100 nonprofit groups to advance the educational, cultural and recreational interests of the City" without regard to whether the lessees are religious. *City's Mem. P. & A. in Opp. to Pls.' Mot. for Summ. J.* at 7 (citing Rothans Decl. ¶ 19).

The Court agrees with Plaintiffs that the City's leases with other organizations are irrelevant because there is no evidence that the parkland leases were negotiated as part of any leasing "program." Defendants do not point to any program criteria to which the City adheres when it leases public property, but instead rely on the bare fact that the City leases land to a large number of nonprofits. While the City does lease property to a large number of non-profits, *Pls.' Resp. to Defs.' SSUMF* ¶ 63, the undisputed evidence shows that the Balboa Park lease is not the result of a selection process by which any other entities had the opportunity to compete with the BSA–DPC, but is instead the result of exclusive negotiations between the City and the BSA–DPC. The City Council voted on December 4, 2001, eight years before the 1957 lease expired, to continue leasing the property to the BSA–DPC, *id.* ¶ 13, after this lawsuit was filed, after the BSA–DPC approached the City and requested negotiations to extend the lease and after hearing extensive public comment regarding the Boy Scouts discriminatory policies. *Id.* ¶ 10; *BSA–DPC's Resp. to Pls.' SSUMF* ¶¶ 29–36. On the other hand, neither the City nor the BSA–DPC has presented the Court with any evidence regarding the process by which the Fiesta Island lease was obtained. While there is one reference to the participation of a variety of youth-serving organizations' participation in the creation of the Youth Aquatic Center, *Roy*

*Decl.* ¶ 12, this is not sufficient to demonstrate neutrality in the leasing of the property itself.

The City does have an established process by which City properties are put up for lease, but which was not used in the 2002 lease of the Balboa Park property to the BSA–DPC. *Transc., March 10, 2003 hearing on Cross–Mot.'s for Summ. J.* at 21:18–24. In his deposition, William T. Griffith, the City's Real Estate Assets director, testified at length regarding the process by which the City determines to whom it will lease its public lands. After Real Estate Assets decides that a property is available for leasing, it goes to a committee of the City Council to "get some direction with what they would like us to do with the property." *Cacciavillani Decl.* Ex. 11, *Griffith Dep.* 91:6–92:4. At that point, Real Estate Assets may either solicit interest in the property by doing a request for proposal ("RFP") that includes selection criteria or, recommend an exclusive negotiation with a particular prospective lessee. *Id.* 92:5–93:10; 93:16—94:8. More often than not, the process is competitive and the City generates as much interest as it can by doing an RFP or comparable procedure. *Id.* 93:11–15. When deciding which prospective lessee should receive a non-revenue lease, the City looks at a list of factors, including the proposal, how it serves the public or particular need, whether it adds employment or sales tax, the benefits to the community, the services that the lessee would provide, who the lessee serves in the community, the lessee's mission statement, funding and level of professionalism. *Id.* 94:9–95:16; 105:20–106:11. According to Mr. Griffith, "[t]here's not a lot of encouraging that [the City] need[s] to do in the sense of, hey, we want you to come to the park. I think it's more an issue of—of almost the selection

criteria.... There are organizations that would like to get into the park that there is not space available." *Id.* 139:19–140:7. Ultimately, the Mayor and the City Council decide whether to approve a lease based on information provided them by Real Estate Assets. *Id.* 95:17–20; 107:3–12. The Mayor and City Council also provide guidance to Real Estate Assets through the process and, via the City Manager, make recommendations whether to enter into exclusive negotiations with a particular organization. *Id.* 95:21–96:6. From the outset, Real Estate Assets tries to get a sense from the Mayor and City Council whether they want to negotiate with a particular organization, in which case Real Estate Assets recommends to the City Council or City Council committee that it enter into exclusive negotiations with that organization. *Id.* 108:14–109:6.

The City Council renewed the 2002 Balboa parkland lease 8 years before the 1957 lease expired. Mr. Griffith testified in his deposition that the negotiations concerning the new or renewed lease were effectively the same as exclusive negotiations. *Id.* 133:20–10; 134:23–135:5. The City's RFP process for generating interest and soliciting competitive bids was not implemented. *Id.* 134:11–13. Instead, Real Estate Assets was "given direction to negotiate an extension of [the DPC–BSA's]—or a renegotiation of their existing lease for [an] additional term on the lease of years—term of years on the lease. And since that authorization was given, they were—there was six or seven years left on the term of their lease. It would have the same effect. We couldn't have done an RFP at that point because there was six or seven years left on their lease. So I don't think the—we actually requested an exclusive negotiation because we couldn't have negotiated with anyone else for seven—seven years anyway." *Id.* 135:6–20.

The BSA–DPC disputes Plaintiffs' statement that the City entered into exclusive negotiations with the Boy Scouts, arguing that "[n]o other party has ever approached the city with an interest in leasing Camp Balboa." *Pls.' Resp. to Defs.' SSUMF* ¶ 12. At oral argument, counsel for the City stated that

> the City Manager did negotiate exclusively with the Boy Scouts for the City of San Diego for the Camp Balboa lease. That did not prevent any other organization from submitting a bid. There was an extensive public hearing on the City Council's decision, on December 4, whether to renew these leases, or the Camp Balboa lease. There were dozens and dozens of speakers.... Any organization, youth-serving or otherwise, could have come in and said, "we can make a better deal than the Boy Scouts made." The exclusive negotiations were between the manager and the Desert Pacific Counsel. The City Council had the final decision after a public hearing. There was a noticed public hearing. All comers could have come and offered a better deal, should they have chosen to do so. While I appreciate the fact that these were exclusive negotiations, that doesn't preclude the fact of opportunity for some other group to come in and say, "we could do better," and no one did.

*See Transc., March 10, 2003 Hrg. on Cross–Mots.' for Summ. J.* at 20:18–2112. The burden, however, was on the City to take affirmative steps to avoid an Establishment Clause violation by making the lease available to the religious, areligious and irreligious on a neutral basis.

Rather than provide all interested organizations a meaningful opportunity to demonstrate their respective capacities for providing the desired service, the City pro-

vided not even the pretense of neutrality. Its reliance on the public's right to speak at the City Council meeting in opposition to the lease, which was already negotiated and on the meeting agenda for final approval, does not provide competing organizations a real opportunity to lease the property. By entering into exclusive negotiations with the BSA–DPC without affording others a real opportunity to compete, the City effectively prevented any secular groups from having an opportunity to obtain the benefit. The City handpicked as the preferred lessee an organization that describes religious belief and practice as fundamental to the services it provides. A reasonable observer would most naturally view the exclusive negotiations and effective preclusion of secular groups as the City's endorsement of the BSA–DPC because of its inherently religious program and practices.

 The material undisputed facts accordingly show that the Balboa Park lease violates the federal Establishment Clause. Plaintiffs' Motion for Summary Judgment on this claim is therefore **GRANTED** as to the Balboa Park lease. The Plaintiffs' and Defendants' Cross–Motions for Summary Judgment are **DENIED** regarding Plaintiffs' claim that the Fiesta Island lease violates the federal Establishment Clause because none of the parties have presented any evidence regarding the process by which the City leased the Fiesta Island property to the BSA–DPC.

## III. California Constitution's Religion Clauses

The California Constitution contains two clauses concerning separation of church and state that are in issue here: (1) the No Preference Clause in Article I, section 4; and (2) the No Aid Clause in article XVI,

section 5. They are addressed independently of Plaintiff's federal Establishment Clause claim because "state courts have not limited their interpretation of the California Constitution to the United State's Supreme Court's interpretation of the federal constitution." *Hewitt v. Joyner*, 940 F.2d 1561, 1566 (1991). "[T]he state courts have developed a body of law regarding the appropriate relationship between religion and the state which is independent from that of federal courts." *Id.* at 1565.

### A. The No Preference Clause

 The state constitution guarantees the "[f]ree exercise and enjoyment of religion without discrimination or preference" and prohibits the state legislature from making a "law respecting an establishment of religion." Cal. Const. Art. I, sec. 4. California courts have repeatedly indicated that the state's establishment clause is broader than the federal establishment clause due to its "no preference" clause. *East Bay Asian Local Development Corp. v. California*, 24 Cal.4th 693, 719–20, 102 Cal.Rptr.2d 280, 13 P.3d 1122 (2000). That clause is satisfied when the government action in question does not endorse the religious views and beliefs of a particular religion or give "favored status to religion in general." *Christian Science Reading Room Jointly Maintained v. City and County of San Francisco*, 784 F.2d 1010, 1014, 1015 (9th Cir.1986). Even an appearance of preference is prohibited and whether the government's action has a secular purpose is irrelevant. *Hewitt v. Joyner*, 940 F.2d 1561, 1567, 1569 (9th Cir. 1991). Public entities are subjected to a "demanding standard of constitutional compliance." *Murphy v. Bilbray*, 782 F.Supp. 1420, 1429 (S.D.Cal.) (Thompson, J.), *aff'd sub nom. Ellis v. City of La Mesa*, 990 F.2d 1518 (9th Cir.1993).

The state supreme court most recently applied the No Preference Clause in *East Bay Asian Local Development Corp.* Nonprofit organizations challenged as unconstitutional a state law granting religiously affiliated organizations the power to declare themselves exempt from historic preservation laws if they can determine in a public forum that the organization would suffer a substantial hardship if the property were designated a historic landmark. Plaintiffs argued that the statutes violated the No Preference Clause and the No Aid Clause.

*East Bay* holds that the No Preference Clause does not disallow state exemptions for religious organizations from state laws that would, if no exemption were provided, abridge those organizations' free exercise of religion. *Id.* at 720, 102 Cal.Rptr.2d 280, 13 P.3d 1122; *Catholic Charities of Sacramento, Inc. v. Superior Court,* 109 Cal.Rptr.2d 176, 189 (2001). While the lead opinion declined to definitively construe the No Preference Clause, it did provide that "the plain language of the clause suggests ... that the intent is to ensure that free exercise of religion is guaranteed regardless of the religious nature of the religious belief professed, and that the state neither favors nor discriminates against religion." *East Bay,* 24 Cal.4th at 719, 102 Cal.Rptr.2d 280, 13 P.3d 1122. *East Bay* is therefore of no real assistance here, since the state supreme court declined to definitively construe the No Preference Clause and the Plaintiffs here do not challenge as unconstitutional an exemption in protection of free exercise.

*Woodland Hills Homeowners Organization v. Los Angeles Community College Dist.,* 218 Cal.App.3d 79, 266 Cal.Rptr. 767 (1990), provides guidance. In *Woodland Hills,* a homeowners organization challenged a community college district's long term lease of property to a religious congregation to develop for its religious, educational and private use. Plaintiff challenged the lease as a violation of the no preference and No Aid Clauses. The Court of Appeal held that the lease did not violate the state constitution because the record was devoid of evidence that the lease advanced or aided Judaism or religion generally, and "[t]he District never took a stance, publicly *or* privately, favoring the Congregation over other religious groups or favoring the letting of the parcel only to a religious group." *Id.* at 93–34, 266 Cal.Rptr. 767.

The process by which the District decided to offer the parcel for lease, made the opportunity known to prospective lessees, determined the tentative terms on which the property would be leased and then made the final lease award was public and inclusive so that its outcome was devoid of even an appearance that the District favored the congregation throughout the process. The District's board of trustees initially decided to offer the surplus land for sale to raise finances. When it did not sell, it decided to lease its surplus property. The Board voted to adopt a resolution that the land was offered on a long term lease for no longer than 75 years and for specified uses for a minimum of three million dollars. *Id.* at 85, 266 Cal.Rptr. 767. Notice that the land was available to lease was (1) posted at City Hall, the county administration building and the county courthouse; (2) published in a local Daily Journal for three non-consecutive days; (3) mailed to about 275 people on the District's real property mailing list; and (4) reported about in newspapers, including on the front page of the City's newspaper and in the plaintiff's own newsletter.

*Id.* at 85–86, 266 Cal.Rptr. 767. The District mailed bid packages at the request of 41 interested bidders and held a written bid opening and an opportunity for oral bidding. The congregation's bid was the only bid received. The board reviewed and approved it. The District and the congregation entered a 75–year lease for three million and twenty-five thousand dollars. *Id.* at 86, 266 Cal.Rptr. 767.

■ Here, as is set forth above, the City engaged in private, exclusive negotiations culminating in another long term lease of the Balboa Park property in the midst of this litigation and despite public outcry. More important in this context, the City determined to re-lease the property to the BSA–DPC, engaged in exclusive negotiations with the organization and re-leased the property to the organization without ever implementing its own process by which it puts properties up for lease.[2] *Transc., March 10, 2003 Hrg. on Cross–Mot.'s for Summ. J.* at 21:18–24. Public comment was not heard until the City and the BSA–DPC had already negotiated the material terms of the lease. Given that context, Defendants contention that other organizations were not prevented from submitting a bid sounds particularly disingenuous. *See Transc., March 10, 2003 Hrg. on Cross–Mot.'s for Summ. J.* at 20:18–2112. By failing to make it publicly known that the land was available for lease, the City effectively precluded any competing offers.

■ In practical terms, the City has bestowed upon the BSA–DPC—an admittedly religious, albeit nonsectarian, and discriminatory organization—the benefits of (1) valuable parkland for a nominal fee despite the City's written policy against leasing that very property to discriminatory organizations, *BSA–DPC's Resp. to Pls.' SSUMF* ¶¶ 57–58; (2) with the accommodation that the City will not apply the leases' nondiscrimination clauses to the organization's membership, *id.* ¶¶ 15, 16, 59; (3) with the authority to exclusively occupy portions of the leased parkland for the purpose of administering the BSA–DPC's regional program and operating endeavors such as the print shop and the revenue-earning Scout Shop with about $1 million per year in net sales, *id.* ¶¶ 75–77, 79, 83–88, 90, 104–109; and (4) the authority to charge the public user fees which are deposited into the general operating account and not designated for administration or upkeep of the leased properties.[3] *Id.* ¶ 114, 117, 118. As is set forth above, the City selected the BSA–DPC to receive the benefit of the lease without public notice and an inclusive selection process. This preferential treatment has at least the appearance, if not the actual effect, of government advancement of religion generally and government endorsement of an organization whose religiosity is fundamental to its provision of youth services in violation of the state constitution's No Preference Clause. Plaintiffs' Motion for Summary

---

2. The City's process for offering properties for lease was not implemented and whether compliance with it would have satisfied the City's obligations under the federal or state constitution is not considered here.

3. Individuals not eligible for membership in the Boy Scouts, including agnostics and atheists, have the take-it-or-leave-it option of forgoing use of public parkland or paying usage fees to the discriminatory organization. The

BSA–DPC maintains that the fees cover the costs of operating the facility. *BSA–DPC's Resp. to Pls.' SSUMF* ¶ 114–118. There is disputed evidence that the BSA–DPC charges Non–BSA–DPC campers a higher usage fee. *Id.* ¶ 114. The BSA–DPC cites. to deposition testimony that Scouts and non-Scouts pay the same fee. *Id.*

Judgment as the claim for violation of the state constitution's No Preference Clause is **GRANTED** as to the Balboa Park lease. Again, because none of the parties here presented any evidence concerning the process by which the City leased the Fiesta Island property to the BSA–DPC, all Cross–Motions for Summary Judgment are **DENIED** as to Plaintiffs claim that the Fiesta Island lease violates the state constitution's No Preference Clause.

## B. The No Aid Clause

 The state constitution also provides that no city

> [1] shall ever make an appropriation, or pay from any public fund whatever, *or grant anything* [2] *to or in aid of any religious sect, church, creed, or sectarian purpose,* ... nor shall any grant or donation of personal property or real estate ever be made by ... any city ... for any religious creed, church, or sectarian purpose whatever.

Cal. Const. Art XVI, sec. 5. "[T]he test of the provision has enormous breadth. It is possible for the government's transfer of 'anything' to violate the provision if the transfer is 'in aid of' any 'sectarian purpose.'" *Paulson v. City of San Diego,* 294 F.3d 1124, 1129 (9th Cir.2002)(en banc). Whether the aid, which need not be financial or tangible, has a secular purpose is irrelevant. *Id.* at 1130. The clause "bans any official involvement, whatever its form, which has the direct, immediate, and substantial effect of promoting religious purposes." *Id. See also Christian Science Reading Room,* 784 F.2d at 1016; *California Educational Facilities Authority v. Priest,* 12 Cal.3d 593, 605, 116 Cal.Rptr. 361, 526 P.2d 513 (1974). As such, it is "the definitive statement of the principle of government impartiality in the field of religion." *Priest,* 12 Cal.3d at 604, 116 Cal. Rptr. 361, 526 P.2d 513. It is "intended by its framers 'to guarantee that the power, authority, and financial resources of the government shall never be devoted to the advancement or support of religious or sectarian purposes.'" *Id.;* see also *Paulson v. City of San Diego,* 294 F.3d 1124, 1130 (9th Cir.2002).

 The parties do not dispute that the City has granted the BSA–DPC a benefit by leasing the subject properties to the organization for its own and the public's use. The issue, then, is whether the leases are aid to a religious purpose and, if so, whether the benefit is "indirect, remote or incidental." Defendants argue that the BSA–DPC has no religious purpose because it is a non-sectarian organization. Defendants cite to no authority, and the Court is unaware of any authority, restricting application of the No Aid Clause to instances where the government aid promotes the purposes of one religion over those of another. Although the clause itself refers to "sectarian purposes," California courts and the Ninth Circuit have consistently and for many years interpreted the clause as prohibiting aid to "religious purposes" and, when using the word "sectarian" have used it synonymously with "religious." *See e.g., Paulson,* 294 F.3d at 1130–31; *East Bay,* 24 Cal.4th at 720, 102 Cal.Rptr.2d 280, 13 P.3d 1122; *Woodland Hills Homeowners Organization,* 218 Cal. App.3d at 93, 266 Cal.Rptr. 767; *Priest,* 12 Cal.3d at 605, 116 Cal.Rptr. 361, 526 P.2d 513. Those same courts have also recognized that all groups, including those opposed to organized religion, may be offended by governmental aid to a religious purpose. *Paulson,* 294 F.3d at 1131. That the BSA–DPC is a religious organization that promotes religious belief and religious practices in general is undisputed and am-

ply supported by the record. That it is a non-sectarian organization and whether it conducts religious activities in accordance with one particular faith is immaterial.

■ Still, the leases do not violate the No Aid Clause if the benefit to the BSA–DPC is "properly characterized as indirect, remote, or incidental." *Paulson,* 294 F.3d at 1131. The benefit "may qualify as 'incidental' if the benefit is available on an equal basis to those with sectarian and those with secular objectives." *Id.* The parties agree that *Woodland Hills Homeowners Organization* and *Christian Science Reading Room* are the pivotal cases. As is set forth above, the California Court of Appeal found in *Woodland Hills Homeowners Organization* that the neutral process by which the community college district leased the land to the Congregation safeguarded it from any appearance that it had favored Judaism or religion generally. For that reason, the lease did not violate the no preference or No Aid Clauses of the state constitution.

■ The Ninth Circuit likewise held in *Christian Science Reading Room* that the Airport's rental of commercial space in its terminal to the Reading room was an arm's length transaction and that the policy by which it rented space to various entities "did not favor or prefer any individual religion, or religion as a whole." *Christian Science Reading Room v. City and County of San Francisco,* 784 F.2d at 1015–16. The benefit to the Reading Room was therefore indirect and incidental to the lease itself. *Id.* at 1016. For the same reasons set forth above, the BSA–

DPC did not enter into the Balboa Park lease as the result of an arm's length transaction. Instead, the City selected the BSA–DPC for favored status. The aid enjoyed by the BSA–DPC as a result of that lease may therefore not be characterized as "indirect, remote or incidental." Whether the aid enjoyed by the BSA–DPC as a result of the Fiesta Island lease is "indirect, remote or incidental" is, on the other hand, indeterminable here because none of the parties has presented the Court with any evidence concerning the process by which the City leased that property to the BSA–DPC. Plaintiffs' claim for violation of the state constitution's No Aid Clause is **GRANTED** as to the Balboa Park lease. The Cross–Motions for Summary Judgment as to Plaintiffs' claim that the Fiesta Island lease violates the No Aid Clause are **DENIED.**

## IV. Federal and California Equal Protection Clauses

■ The Equal Protection Clause of the federal constitution's Fourteenth Amendment "commands that no State shall deny to any person ... the equal protection of the laws, which is essentially a direction that all persons similarly situated should be treated alike." [4] *City of Cleburne v. Cleburne Living Center, Inc.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). Its purpose is to ensure that the state does not intentionally and arbitrarily discriminate against individuals. *Personnel Administrator of Massachusetts v. Feeney,* 442 U.S. 256, 272, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979). State action therefore violates the Equal Protection

---

4. The same analysis applies to claims brought under California's Equal Protection Clause, Cal. Const., art. I, § 7, as under the federal constitution's clause. *Bd. of Supervisors v. Local Agency Formation Com.,* 3 Cal.4th 903, 913–24, 13 Cal.Rptr.2d 245, 838 P.2d 1198 (1992); *Griffiths v. Superior Court,* 96 Cal. App.4th 757, 775, 117 Cal.Rptr.2d 445 (2002). The Court therefore analyzes the claims simultaneously.

Clause when it intentionally treats the plaintiff differently from other persons similarly situated in all material ways. *Lee v. City of Los Angeles*, 250 F.3d 668, 687 (9th Cir.2001). Here, the parties dispute whether the leases result in any disparate treatment at all and, if so, whether that disparate treatment is the reason for the City's decision to lease the parklands to the BSA–DPC. Specifically at issue is whether the City intended to discriminate against Plaintiffs and those similarly situated, and whether there has been actual discrimination.[5] The Court finds that there is a dispute of material fact concerning each issue for the following reasons.

## A. Disputed evidence of discriminatory intent

 Plaintiffs contend that the City has discriminated against them and those members similarly situated to them because it knew that by leasing the parkland to the BSA–DPC it could effectively discriminate against gays, agnostics and atheists by discriminating against the public as a whole. To prevail on their unique theory, Plaintiffs must show that the record includes undisputed evidence of intentional discrimination and of unequal access to the parkland. Proof of discriminatory intent or motive is necessary to sustain an equal protection clause challenge. *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 265, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); *Lee*, 250 F.3d at 687. It is not enough to show only that a law has a disparate impact on a identifiable group. *Village of Arlington*

*Heights*, 429 U.S. at 264–65, 97 S.Ct. 555 (citing *Washington v. Davis*, 426 U.S. 229, 242, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976)); *Hispanic Taco Vendors of Washington v. City of Pasco*, 994 F.2d 676, 679 (9th Cir. 1993). When the challenged law is facially neutral, it must be shown that the purpose for enacting the law was at least in part " 'because of,' not merely 'in spite of,' " its disparate impact on an identifiable group of persons. *Feeney*, 442 U.S. at 279, 99 S.Ct. 2282. That the law would have inevitable or foreseeable consequences on an identifiable class of persons raises a strong inference of discriminatory intent. *Id.* at 279 n. 25, 99 S.Ct. 2282. That inference must, however, "ripen into proof" with other evidence. *Id.* Other evidence of discriminatory intent or motive may include the law's historical background, irregularities in the laws' passage, and the legislative or administrative history. *Arlington Heights*, 429 U.S. at 266–67, 50 L.Ed.2d 450; *Navarro v. Block*, 72 F.3d 712, 716 (9th Cir.1996).

Because Plaintiffs are pursuing a disparate impact theory of discrimination, the issues of actual discrimination and intent to discriminate are related. The Court finds that there is a dispute of material fact as to both issues. Plaintiffs' theory is that the City Council "set in motion" a series of events it reasonably should have known would result in constitutional deprivation because it knew about the BSA–DPC's discriminatory membership policy and that the BSA–DPC would exclude non-Scouts from the properties by making exclusive use of the leased facilities from

---

**5.** Also at issue is whether the leases alone are sufficient evidence of a relationship between the BSA–DPC and the City so that the BSA–DPC's discriminatory actions may be fairly attributed to the City. The parties have not addressed this argument as a distinct require-

ment. While the Court would address this in terms of whether the BSA–DPC is a state actor, it need not address it at all because the parties' summary judgment motions are denied on other grounds.

time to time.[6] They make several points to support their contention that there is evidence in the record that the City intended to discriminate against Plaintiffs and those similarly situated. The Court addresses each in turn.

First, the Fiesta Island lease explicitly allows exclusion of the public up to 75% of the time.[7] As Defendants argue, it is true that there is no evidence that any member of the public has been denied access, and that section 9.06 of the lease requires that the Youth Aquatic Facility be open to all youth-serving groups and that "to give all groups an equal chance to use the Youth Aquatic Facility, [the BSA–DPC] must send a letter annually to all the members of the Youth Aquatic Advisory Council advising them of your operation and procedures to use the facilities." *City's NOL* Ex. 2 at § 9.06(1)-(2). These facts do not controvert the fact that the lease also provides that the BSA "can use/book no more than 75% of all available aquatic activities up to 7 days prior," thereby enabling the BSA–DPC, a discriminatory organization, to have to the facility superior to that of the public. However, while this undisputed fact obviously shows that the City must have intended to allow the BSA–DPC to potentially reserve a larger portion of the

facilities than the public, it is not undisputed evidence of the City's intentional discrimination toward Plaintiffs and those similarly situated.

Next, Plaintiffs contend that the City's decision to construe the nondiscrimination clauses prohibiting discrimination on the basis of, among other classifications, religion and sexual orientation, as not applying to the BSA–DPC's membership is evidence of its intent to discriminate. *Id.* at § 7.04; *City's NOL* Ex. 23, FAC Ex. at § 7.04. Unlike other governmental entities, the City decided not to condition its release of the Balboa Park property to the BSA–DPC on the organization's avowal that it would not, contrary to its current policy, discriminate in membership. *See e.g., Boy Scouts of America v. Wyman,* 335 F.3d 80 (2d Cir.2003); *Evans v. City of Berkeley,* 127 Cal.Rptr.2d 696 (2002)(petition for review granted). On the other hand, Plaintiffs point to no evidence that the BSA–DPC has discriminated against any individual in violation of this lease term. Without more, the City's construal of the nondiscrimination clause does not evidence an intent. It shows only that the City leased the parkland to the BSA–DPC despite its discriminatory practices.[8] Plaintiffs must show that its reason for

---

**6.** Plaintiffs also argue that the City knew that the BSA–DPC would enforce and comply with the discriminatory membership policy from the parkland property and knew that the BSA–DPC had terminated one adult leader's volunteer membership because he is gay and that it did so by mailing a letter from the parkland property. These arguments are not relevant to the issue of whether Plaintiffs and those similarly situated have access to the parklands equal to that of any other member of the public. Plaintiffs do not challenge the BSA's constitutionally protected, discriminatory membership policy applying to youth and adult members.

**7.** Plaintiffs also argue that the Court has already determined that the BSA–DPC uses the parkland exclusively for blocks of time, citing to the Court's Order finding that Plaintiffs had standing to bring the claims addressed in this Order. The findings that the Court made in that initial Order regarding usage were preliminary, before the parties had completed discovery and before the record that is now before the Court had been developed.

**8.** It is this Court's opinion that the City could refuse to lease the parkland to the BSA–DPC because it is discriminatory without violating the organization's First Amendment rights. That does not, however, translate into the requirement that the City must refuse to lease

enacting the law was at least in part " 'because of,' not merely 'in spite of,' " a disparate impact on the Plaintiffs and those similarly situated. *Feeney,* 442 U.S. at 279, 99 S.Ct. 2282.

Next, Plaintiffs contend that the City knew that the BSA–DPC would make exclusive use of the properties from time to time, thereby barring the public, including Plaintiffs and those similarly situated, from access to the parklands. As is set forth below, the extent to which the BSA–DPC has exclusive or preferential use of the parkland is disputed.

Finally, Plaintiffs point out that the City failed to follow procedural requirements in renewing the 2002 Balboa Park lease as evidence of a discriminatory intent to preclude equal access to the public and therefore to gays and nonbelievers. *Id.* "[D]epartures from established practices may evince discriminatory intent." *Nabozny v. Podlesny,* 92 F.3d 446, 455 (7th Cir.1996)(citing *Village of Arlington Heights,* 429 U.S. at 267, 97 S.Ct. 555). Plaintiffs contend that the City Council violated the City's own policy, San Diego City Council Policy No 700–04, against leasing Balboa Park property to discriminatory organizations and rejected its own Real Estate Assets Department's recommendation that a 10–year lease was sufficient to amortize the BSA–DPC's capital improvements and instead approved a 25 year lease with a 15 year renewal option. The City does not deny that it is leasing the Camp Balboa parkland to the BSA–DPC despite San Diego City Council Policy No. 700–04.

Having reviewed the parties' arguments and the evidence to which they point, the Court concludes that there is a sufficient dispute of material fact to preclude summary judgment in favor of either party on the issue of whether the City leased the parkland with intent to discriminate against Plaintiffs and those similarly situated. For the reasons set forth below, the Court also finds that there is a sufficient dispute of material fact to preclude summary judgment in favor of either party on the issue of whether the public and therefore the Plaintiffs and those similarly situated have unequal access to the public parkland.

**B. Disputed evidence of discriminatory effect**

"[I]n order for a state action to trigger equal protection review at all, [the state] action must treat similarly situated persons disparately." *Silveira v. Lockyer,* 312 F.3d 1052, 1088 (9th Cir.2003)(citing *City of Cleburne,* 473 U.S. at 439, 105 S.Ct. 3249); *McLean v. Crabtree,* 173 F.3d 1176, 1185 (9th Cir.1999). Plaintiffs argue that they are afforded inferior access to and use of the parklands in comparison to the access afforded members of the general public who, if they desire, may become members of the BSA–DPC. Unlike the general public, Plaintiffs are not able to use the parkland as members of the public or as members of the BSA–DPC when it is booked for "Scout only" use.[9]

Whether and the extent to which the BSA–DPC has exclusive or preferential

---

the parklands or that its decision to lease the parklands despite the BSA–DPC's discrimination is evidence of its own intent to discriminate.

9. Plaintiffs also argue that they are afforded inferior access to the leased parkland because the City does not construe the leases' nondiscrimination clauses as applying to BSA–DPC membership or employment related to the parkland. The Court views this argument as a red herring since Plaintiffs neither allege employment discrimination nor challenge the

use of the parkland is disputed. The BSA–DPC contends that it offers reservations on a first-come, first-served basis and that the only reason anybody has been denied access to the parklands is because of a pre-existing reservation. *Pls.' Resp. to City's SSUMF* ¶ 47. On the other hand, the record does contain evidence that the Boy Scouts are able, by penciling in their own reservations in advance, to effectively preclude others from using the parklands during periods of high demand. *BSA–DPC's Resp. to Pls.' SSUMF* ¶¶ 26, 126–128. The BSA–DPC offers contradictory explanations for how it takes reservations for use of the Balboa Park property, claiming both that anybody can make reservations as far in advance as they wish, *BSA–DPC's Resp. to Pls.' SSUMF* ¶¶ 123, 124, but also that reservations could be made up to three months in advance and would be accepted only if there was no conflict with "other scheduled Scouting functions." *Id.* ¶ 123. The Fiesta Island lease, on the other hand, explicitly allows the BSA–DPC to "use/book" up to "75% of all available aquatic activities up to 7 days prior," effectively enabling at least a portion of the public to always use the facilities as long as they plan at least one week in advance. *Id.* ¶ 26.

Neither is it clear the extent to which the BSA–DPC actually monopolizes the parklands. While Plaintiffs contend that the BSA–DPC at times enjoys periods of exclusive use, Pls.' SSUMF ¶ 19, the BSA–DPC contends that it never uses 100% of the available space at Camp Balboa or at the Aquatic Center. *BSA–DPC's Resp. to*

Pls.' *SSUMF* ¶ 19. While Plaintiffs state that the Balboa Park campground is unavailable to the public and reserved for Cub Scout Day Camp for approximately eight weeks during the summer, *Pls.' SSUMF* ¶ 130, the BSA–DPC asserts that the public may use remaining campgrounds and other facilities. *BSA–DPC Resp. to Pls.' SSUMF* ¶ 130. Copies from the Camp Balboa reservation book do, in fact, state that the BSA–DPC has monopolized the campground for periods of time.[10] Other documents confirm camp closures for periods of time. *Cacciavillani Decl. Ex.* 62. The BSA–DPC does not dispute that it monopolizes the campgrounds for periods of time and relies only on the fact that the public may use the parkland's other facilities. *BSA–DPC's Resp. to Pls.' SSUMF* ¶¶ 131, 132; 133. For example, it responds that Camp Balboa "was not in fact closed" during the summer of 2001 because "the Girl Scouts reserved the pool" for specified dates and, in response to the remaining closures states that "Scout groups never use 100% of available space at Camp Balboa." When asked how often the BSA–DPC uses the entire campground, the organization's witness estimated "[probably] not half the time." *Cacciavillani Decl.* Ex. 37, Kienke Dep. 63:24–644. He explained that "scouting groups come in and maybe do something like a camparee, and they would—they would possibly request all—the whole area." *Id.* at 64:24–65:3. Camparees usually last from a Friday night until Sunday. *Id.* at 65:9–10; *Plfs.' SSUMF* ¶ 134. Kienke further testified that while non-scouting groups can reserve a campsite during a

Boy Scout's right to have a discriminatory membership policy.

**10.** The BSA–DPC reserved the entire campground from July 2 through August 17, 2001 for its Summer Day Camp; from February

23–25, 2001 for Spring Encampment; from March 23,–25 for an unspecified reason; again from May 25–27, 2001; and again December 31, 2001–January 5, 2002. *Pls.' SSUMF* ¶ 131, *Pls.' NOL* Exs. C, D.

day-camp period at Camp Balboa, that he was not aware of any such instance. *Id.* 170:13–23.

Neither does the BSA–DPC disagree that the Fiesta Island facility is unavailable to the public for six weeks during the summer when the Scouts conduct a summer camp program, four weeks of which are reserved exclusively for the Boy Scouts. *Pls.' SSUMF* ¶¶ 138–140. Rather, the BSA–DPC again states that groups are still able to use certain parts of the facility, here stating that groups regularly reserve the dormitories and that two weeks of Sea Camp is open to non-Scout youth groups. *BSA–DPC's Resp. to Pls.' SSUMF* ¶¶ 139, 142.

Both sides have offered statistics quantifying actual BSA–DPC usage in comparison to public usage. Plaintiffs rely on documents prepared by the BSA–DPC before litigation was initiated and measure usage in terms of the number of individual Scouts versus number of individuals from the public. Defendants rely on a statistical study done for the purposes of litigation and measure usage in terms of "available days." The Youth Aquatic Center's 2001 Quarterly Reports show that the BSA–DPC made up almost two-thirds of users of that facility. Another one-fourth of the users came with another youth organization called Sea Camp, and the general public made up the remainder, about 10%. *Plfs.' SSUMF* ¶ 143. At the December 4, 2001 City Council hearing, counsel for the BSA–DPC, measuring usage in terms of users, stated that "one in five guests at Camp Balboa are [sic] not members of the Boy Scouts." *Cacciavillani Decl.* Ex. 16; *Amended Transc. of San Diego City Council Hearing of Dec. 4th, 2001* at 35:5–6. Here, the BSA–DPC, using the concept of "available days," contends that

Overall, non-Scout groups are the primary users of the Aquatic Center. In the first three quarters of 2002, on 66% of the available days a non-Scout group used some function room or aquatic equipment at the Aquatic Center, and on 28% of available days a Scout group used some such room or equipment. In 2001, on 47% of available days a non-Scout group used some function room or aquatic equipment at the Aquatic Center, and on 30% of available days a Scout group used some such room or equipment. In 2000, on 26% of available days a non-Scout group used some function room or aquatic equipment at the San Diego Youth Aquatic Center, and on 29% of available days a Scout group used some such room or equipment.

*BSA–DPC's Resp. to Pls.' SSUMF* ¶ 143.

The Court cannot conclude based on the record before it that the public, and therefore the Plaintiffs and those similarly situated, have unequal access to the public parkland. Not only are Plaintiffs pursuing a novel theory of discrimination, the issues of whether the public itself has been afforded unequal use of the parkland and whether the City leased the parkland to the BSA–DPC at least in part for the purpose of affording unequal access are disputed. The parties' Cross–Motions for Summary Judgment are therefore **DENIED.**

## V. State common law claim

Plaintiffs contend that the leases are in violation of state common law requiring that public parkland not be diverted from public use because the leases allow the BSA–DPC to use significant portions of the parkland for its private, administrative purposes, including the enforcement of its discriminatory membership policy, and be-

cause the leases enable the BSA–DPC, a private and discriminatory organization, to have preferential use of the parkland. To support its claim, Plaintiff relies on a line of cases exemplified by *San Vicente Nursery School v. County of Los Angeles*, 147 Cal.App.2d 79, 304 P.2d 837 (1956), in which the California Court of Appeal found that a private school's exclusive use of a building in a public park was an unlawful diversion of public park property because it was to the unreasonable exclusion of members of the public and benefitted only the limited number of children attending the school. *See id.* at 86, 304 P.2d 837. *See also Slavich v. Hamilton*, 201 Cal. 299, 257 P. 60 (1927).

On the record before the Court Plaintiffs' argument would have great appeal were it not for the fact that the City of San Diego is a charter city with plenary power in municipal affairs subject only to federal and state constitutional law and the charter itself. Cal. Const., art. XI, sec. 5; *Ainsworth v. Bryant*, 34 Cal.2d 465, 469, 211 P.2d 564 (1949). With regard to its municipal affairs, the City is not subject to the state common law on which Plaintiffs rely. "[T]he city has all powers over municipal affairs, otherwise lawfully exercised, subject only to the clear and explicit limitations and restrictions contained in the charter.... Thus in respect to municipal affairs the city is not subject to general law except as the charter may provide." *City of Grass Valley v. Walkinshaw*, 34 Cal.2d 595, 598–99, 212 P.2d 894 (1949). "The power of a charter city over exclusively municipal affairs is all embracing, restricted and limited only by the city's charter, and free from any interference by the state through the general laws." *Simons v. City of Los Angeles*, 63 Cal. App.3d 455, 468, 133 Cal.Rptr. 721 (1976).

While the task of determining whether a particular activity is a "municipal affair" is typically an ad hoc inquiry, *City of Long Beach v. Dep't of Industrial Relations*, 110 Cal.App.4th 636, 1 Cal. Rptr.3d 837, 845–846 (2003), it is well established that "park regulation is a municipal affair." *Id.* at 467, 133 Cal.Rptr. 721. "A charter city has inherent authority to control, govern and supervise its own parks. The disposition and use of park lands is a municipal affair." *Id.* at 468, 133 Cal.Rptr. 721 (internal quotations omitted). *See also City of Marysville v. Boyd*, 181 Cal.App.2d 755, 757, 5 Cal.Rptr. 598 (1960) (holding that charter city had authority to deed public parkland to the county for the purpose of erecting a courthouse in part because city's charter was silent on issue); *Wiley v. City of Berkeley*, 136 Cal.App.2d 10, 15, 288 P.2d 123 (1955).

Plaintiffs argue that this case is materially distinct from the cases to which Defendants cite because the latter deal with conflicts between state legislation and city charters, whereas here the conflict is between the city charter and state common law. Plaintiffs do not explain how the distinction is material and the argument ignores the sweeping grant of authority provided to charter cities. Plaintiffs also contend that their claim "does not deal with how the City operates or regulates Mission Bay Park or Balboa Park," but with "the ability of all citizens to access public parkland in the first instance." *Pls.' Reply to City's Opp. Br.* at 8. Defendants do not dispute that the City is subject to federal and state constitutional law, and Plaintiffs' claims attacking the leases as being in violation of federal and state constitutional law are discussed above. The argument is an attempt to bootstrap this state common law claim into a consti-

tutional law claim. Plaintiffs' constitutional law claims are considered separately. Finally, Plaintiffs contend for the first time in their opposition brief that the leases violate section 55 of the City Charter itself, which rededicates Balboa Park thereby affirming the city and state dedications that the lands be held in trust forever for public use. *Pls.' Opp. to City's Mot. for Summ. J.* at 26. A party may not defeat summary judgment by asserting new legal theories in an opposition brief. *See Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1293 (9th Cir.2000). As a charter city, the City of San Diego is not subject to common law in the leasing of the parklands at issue here. Defendants' Cross–Motions for Summary Judgment on Plaintiffs' state common law claim are **GRANTED.**

## VI. The BSA–DPC's First Amendment right to free expression

■ The BSA–DPC's right to hold and express its private views is not in issue here. Plaintiffs do not challenge the BSA–DPC's right as an expressive organization to discriminate in its membership against gays and nonbelievers. Rather, Plaintiffs challenge the parkland leases as the City's unconstitutional endorsement of the BSA–DPC as a religious organization and as the means to discriminate against gays and nonbelievers. Nonetheless, Defendants argue that rescission of the leases would be unconstitutional viewpoint discrimination. Defendants contend that the BSA–DPC not only has the right to discriminate privately against gays and nonbelievers, but that it also has the right to do so while leasing the parkland property. Contrary to Defendants' argument, the BSA–DPC's status as an expressive organization does not entitle it to governmental aid, especially on terms more favorable than those held by other, nondiscriminatory, organizations.

Defendants argue that the BSA–DPC is the beneficiary of a leasing program analogous to the programs in a line of cases exemplified by *Rosenberger v. Rector and Visitors of the University of Virginia,* 515 U.S. 819, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995). In *Rosenberger,* the University of Virginia created a campus program whereby student groups submitted bills for student activities related to educational purposes from outside contractors for payment by the fund, which received its money from mandatory student fees. The plaintiff filed suit after the University denied his Christian student newspaper's application for payment of printing costs on the ground that publication of the newspaper was a "religious activity" because it "promoted or manifested a particular belief in or about a deity or an ultimate reality." *Id.* at 827, 115 S.Ct. 2510. The Supreme Court held in part that the University's denial of funding was unconstitutional viewpoint discrimination in a designated public forum and because "[t]here is no Establishment Clause violation in the University's honoring its duties under the Free Speech Clause," since the aid program was neutral toward religion. *Id.* at 840, 846, 115 S.Ct. 2510.

Here, the leases are not the result of a "program," let alone a program neutral toward religion, and there is no nexus between the purpose of the leases and the protected expression. As is set forth above, the City selected the BSA–DPC for preferential treatment. The leases are therefore not part of a designated public forum, but are instead a nonpublic forum in which the City selected its recipient by making the value judgment that the BSA–DPC alone is best suited to fulfill the City's needs with respect to the parkland. *See Transc., March 10, 2003, Hrg. on Cross–Mot. for Summ. J.* at 20:18–21:12.

Whether the BSA–DPC is the lessee of the parkland has absolutely no impact on or connection to the BSA–DPC's ability to maintain its discriminatory membership policy.

The Court accordingly rejects Defendants' argument that rescission of the leases would amount to unlawful viewpoint discrimination. The government does not automatically engage in unconstitutional viewpoint discrimination when it determines, as it did here, whether to award a government subsidy by making a value judgment about the recipient's suitability for the subsidy. *National Endowment for the Arts v. Finley*, 524 U.S. 569, 587, 118 S.Ct. 2168, 141 L.Ed.2d 500 (1998). Finally, Defendants' argument would fail even if the City decided not to lease the parkland to the BSA–DPC because of its discriminatory membership policy. The government's decision to exclude organizations with discriminatory membership policies is viewpoint neutral when the purpose for the decision is to protect persons from the effects of discrimination and not to exact a price for the organization's protected expression. *Wyman*, 335 F.3d at 93–94 (holding that the state's decision to bar the Boy Scouts from a state workplace charitable campaign because it is a discriminatory organization did not violate the organization's First Amendment rights as an expressive association). *See also Cornelius v. NAACP Legal Defense & Educational Fund, Inc.*, 473 U.S. 788, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985). Defendants argument that rescission of the leases would violate the organization's First Amendment right to expression is therefore rejected.

### Conclusion

Having read the parties' briefs, supporting documents and evidence, and the applicable law, and given full consideration to the arguments made by all parties and admissible evidence in support thereof, **IT IS HEREBY ORDERED** that:

(1) Plaintiffs' Cross–Motion for Summary Judgment on their claims that the Balboa Park lease violates the Establishment Clause of the federal constitution and the No Aid and No Preference Clauses of the state constitution is **GRANTED;**

(2) The BSA–DPC and City's Cross–Motions for Summary Judgment on Plaintiff's claim that the parkland leases violate state common law are **GRANTED;**

(3) The Cross–Motions for Summary Judgment on all other claims are **DENIED.**